THE ST. LAWRENCE.

(*District Court, W. D. Pennsylvania.*   January 23, 1884.)

1. WHARVES—RIGHT TO MOOR VESSELS.
      The right of mooring vessels at public wharves is as much to be protected
      as that of navigation itself, but it is to be exercised with due regard to the
      rights of passing vessels, and any unnecessary encroachment upon the chan-
      nel-way which greatly imperils passing craft is without justification.

2. SAME—POSITION OF STEAM-BOAT.
      A steam-boat lying at a wharf-boat at the public landing of Pittsburgh,
      threw her stern out in the way of a descending coal-tow, when she might have
      lain broadside to the wharf-boat, and thus afforded a sufficient passage-way
      for the tow-boat and tow.   A collision occurring, *held*, that the steam-boat
      was answerable to the owner of a coal-boat thereby lost.

3. SAME—COLLISION WITH TOW.
      In case of a collision between a descending coal-tow and a vessel wrongfully
      obstructing the channel-way, the previous fault of another vessel, in striking
      and throwing out of shape the coal-tow, is not to be imputed to the tow-boat,
      if the latter were free from blame.

4. SAME—MUTUAL FAULT—DAMAGES RECOVERABLE FROM EITHER VESSEL.
      An innocent party who sustains loss by reason of the concurrent negligence
      of two vessels may pursue and recover the entire damages from either wrong-
      doer.

In Admiralty.

*Knox & Reed,* for libelants.

*Barton & Son,* for respondents.

ACHESON, J.   The St. Lawrence, a steamer plying in the Pittsburgh
and Cincinnati trade, early on the morning of March 31, 1883, came
into the port of Pittsburgh, landing at the Phillips wharf-boat, which
lies at the public wharf, her usual place for receiving and discharg-
ing cargo and passengers.   This wharf-boat is at the north shore of
the Monongahela river, 840 feet below the Smithfield Street bridge.
The head of the St. Lawrence was to the wharf-boat, and she lay
quartering out in the river, her stern projecting into the coal-boat
channel.   A barge at the lower end and two tow-boats immediately
above the wharf-boat prevented the St. Lawrence, upon her arrival,
from getting broadside against the wharf-boat.   Andrew Hazlett, the
mate of the St. Lawrence, testifies, however, that these tow-boats
moved away between 8 and 9 o'clock that morning.   The Mononga-
hela river was rapidly rising to a coal-boat stage, when the St. Law-
rence came into port, and by 7 o'clock had reached a stage of 9 feet,
and by 10 o'clock that morning had reached 11 feet.   The rise
was altogether out of the Monongahela river, and hence the current
was exceedingly rapid.   Descending coal-tows customarily used the
span between the first and second old piers of the Smithfield Street
bridge, and at that particular time it was the only open span, the
others being then closed by piles and trestle-work, the bridge being
in process of reconstruction.   The "Robinson fleet" of coal-boats, etc.,
consisting of upwards of 40 pieces, lay in the river moored to the

third pier of the bridge, and extending down past the St. Lawrence, or nearly so. This fleet, which had been there for some time, greatly narrowed the passage-way for descending tows. The St. Lawrence still further contracted this passage-way, and her projecting position reduced the space between her and the fleet to 200 feet or less. From the Smithfield Street bridge down to a point below the Phillips wharf-boat, the natural direction of the current is in towards the north shore, and this tendency, on the occasion in question, was rather increased by the obstruction at the bridge already mentioned and the Robinson fleet. It is shown that on a Monongahela rise, the proper method for a tow-boat with a coal-tow, to run this part of the river, is by flank-ing; i. e., setting the tow-boat quartering with her head down stream and in towards the north shore, then backing against the cross cur-rent and floating downward. This of course requires more space than does steering or running head on.

Under all the evidence, I find without hesitation that the St. Law-rence, in the quartering position in which she lay, occupied and was an obstruction to a considerable portion of the working channel used by tow-boats having coal-tows in charge, and which in the then con-dition of affairs it was necessary for them to use, and that her posi-tion was one of great peril both to herself and descending tows. This is substantiated not only by the general testimony but by what act-ually occurred in the space of a very few hours. Hazlett, the mate, states that the St. Lawrence was struck by the tow-boats Sam Rob-inson and the Tide, (he thinks,) and it is in proof that she was also struck by the tow-boat Blackmore, and all this before the disaster out of which this suit grew. Between 9 and 10 o'clock that morning James T. Fawcett went to the St. Lawrence and warned her master, Capt. List, that she was lying right in the channel, endangering both herself and descending coal-tows; and immediately after the Black-more struck her (which it would seem was about half an hour before the disaster under investigation) J. Sharp McDonald gave Capt. List a like warning and advised him to take his boat altogether away from that place.

In anticipation of a coal-boat rise the libelants had employed the tow-boat Abe Hays to take certain coal-boats belonging to them from the Tenth Street bridge down to the foot of Brunot's island, there to be made up in a tow for Louisville. During the forenoon of March 31st, the Abe Hays took in charge one of these coal-boats and proceeded with it down stream. When she had reached a point some 200 feet above the Smithfield Street bridge, the tow-boat Acorn struck her, but doing her no serious damage, and not injuring the coal-boat. The effect of the stroke was to put the Abe Hays somewhat out of shape to run the bridge, but her pilot states she had recovered her-self when she passed under the bridge; and I think the evidence fa-vors the conclusion that she was kept in proper position and rightly handled below the bridge, and throughout was free from fault. Never-

theless the head of her. coal-boat struck the wheel, or immediately forward of the wheel, of the St. Lawrence, passing under her guard. The effect of the collision was to so injure the coal-boat that it sank in a few minutes, and, with its cargo of coal, became a total loss. Immediately after this collision the St. Lawrence changed her position, moving up broadside against the wharf-boat. I am well satisfied from the proofs that had she taken this position sooner, the Abe Hays and her tow would have passed down safely and this loss have been avoided.

The collision occurred about 11 o'clock A. M. Now, it clearly appears that at an earlier hour the tow-boats which lay above the wharf-boat had moved away, and there was nothing to prevent the St. Lawrence from taking, before the catastrophe, the position she took afterwards. Indeed, between the time the Blackmore struck her and the approach of the Abe Hays she might have made this change in her position. That she did not sooner do so—especially in view of the collisions which had already occurred, and the warnings given her master—was entirely inexcusable.

Experienced river men testify that, under the peculiar circumstances then existing, ordinary prudence required the St. Lawrence to avoid, or go away from the Phillips wharf-boat altogether, and take a position at the city wharf, lower down, which the evidence indicates was available to her. Coal-boat rises, as is well known, are often of short duration, and the river must be "taken at the flood" by outgoing coal-tows. There is therefore great force in the argument urged by the libelants' counsel, that it was the duty of the St. Lawrence to yield the whole space between the wharf-boat and the Robinson fleet—none too large for the requirements of the occasion—to descending tows, (*The Exchange*, 10 Blatchf. 168,) but it is not necessary to decide whether or not such was her duty.

The culpability which makes the St. Lawrence justly answerable to the libelants' for the loss of their property, consisted in her unnecessarily encroaching upon the ordinary coal-boat channel by throwing her stern out in the way of descending tows, when she might have lain broadside to the wharf-boat, and thus afforded the Abe Hays a sufficient passage-way.

Undoubtedly the mooring of vessels at public wharves is a well recognized right, as much to be protected by the law as that of navigation itself. But it is to be exercised with due regard to the rights of passing vessels. An unnecessary encroachment upon the channel-way, which greatly imperils passing craft, is without justification. It may have been more convenient to the St. Lawrence to receive and discharge her cargo with her bow to the wharf-boat, but this is a poor excuse for putting in needless jeopardy descending tows.

It is, however, asserted that the Abe Hays had not sufficient power to control and manage her tow, in the then stage of the river and

strong current, and that it was negligence to employ her for the service she undertook. But this defense, I think, is not made out. This employment was her ordinary business, and while she was less powerful than some other tow-boats, she was reasonably fit for the work. On this occasion she had in charge but a single coal-boat, which she had sufficient power to manage had the channel-way which she had a right to use been unobstructed. It is quite true that after she had passed the Smithfield Street bridge, (where her pilot first discovered the projecting position of the St. Lawrence,) she had not power to back up stream, and thus avoid the danger. But tow-boats with coal-tows descending the Monongahela and Ohio rivers are not expected, and ordinarily have not the ability, to back up stream, or even to hold their tows against a strong current. *Fawcett* v. *The L. W. Morgan*, 6 FED. REP. 200. The coal is taken out on freshets, the tow-boat guiding the tow.

It is further claimed on the part of the defense that the Abe Hays, having gone up the river at about 8 o'clock on the morning of March 31st, in sight of the place where the St. Lawrence lay, was chargeable with notice of her position, and therefore was in fault in coming down at all. But the Abe Hays went up without any tow, and the St. Lawrence was not in her way. Her master and pilot state that they do not remember to have observed the St. Lawrence; but if they did, they may well have supposed that she had just come into port or was about to leave. At any rate, they were not bound to assume that she would continue to lie in her then position for several hours, and after coal-tows had commenced coming down.

Again, it is insisted that the disaster was brought about by the previous collision between the Acorn and Abe Hayes. The evidence, however, leads me to a different conclusion. Moreover, in that matter the Acorn was exclusively to blame. Therefore, if her stroke did put the Abe Hays out of shape and thus contributed to the misfortune, her fault is not to be imputed to the innocent vessel.

But did it appear that the Abe Hays was guilty of contributory negligence, what then? The libelants were not her owners nor answerable for her misconduct. Now, it is a recognized principle of law that an innocent party who sustains a loss by reason of the concurrent negligence of two vessels may pursue and recover the entire damage from either wrong-doer. *The Atlas*, 93 U. S. 302; *The Franconia*, 16 FED. REP. 149. And herein is to be found the answer to the suggestion (if true) that the Robinson fleet wrongfully narrowed the coal-boat channel.

The evidence shows the value per bushel of the coal to be as stated in the libel, and as to quality there seems to be no controversy.

Let a decree be drawn in favor of the libelants for the amount of their claim, with interest from March 31, 1883, and costs.