BAKER–WHITELEY COAL CO. v BALTIMORE & O. R. CO.

(Circuit Court of Appeals, Fourth Circuit. May 16, 1911.)

No. 974.

1. MONOPOLIES (§ 16*)—VALIDITY—PIER CONSTITUTING RAILROAD STATION— GRANT OF EXCLUSIVE DOCKING PRIVILEGES TO TUG OWNER.

Defendant railroad company, which was a large interstate carrier of coal from the mines to the seacoast at Baltimore, built at Curtis Bay near there a pier, extending into the navigable water, for the handling of coal intended for transshipment by water. It did not undertake to carry coal beyond its own railroad line, but by its filed and published traffic schedules it made such pier a public terminal station, at which it undertook to deliver all coal so consigned by the bill of lading to "what-

ever vessel or vessels the shipper or consignees of the said coal may designate." *Held* that, while defendant had the right to make and enforce such regulations as were reasonably necessary for the use of the pier by shippers and consignees, it could not lawfully grant to a single tug owner the exclusive right to dock and undock vessels at such pier; it being within the rights of shippers and consignees to employ such tugs as they chose, and the right of such tugs to use the navigable waters surrounding the pier in the performance of such service.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 16.*]

2. INJUNCTION (§ 55*)—PROPERTY RIGHTS PROTECTED—INJURY TO BUSINESS.

A tug owner having contracts with steamship companies to do all towing for their vessels at a certain port, which was prevented from docking and undocking such vessels at a pier by an unlawful order of the owner, was thereby deprived of a property right, and entitled to maintain a suit in equity to enjoin enforcement of such order.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 108, 109; Dec. Dig. § 55.*]

Appeal from the Circuit Court of the United States for the District of Maryland, at Baltimore.

Suit in equity by the Baker-Whiteley Coal Company against the Baltimore & Ohio Railroad Company. Decree for defendant (176 Fed. 632), and complainant appeals. Reversed.

J. C. McLanahan and Joseph C. France, for appellant.
R. Marsden Smith and H. R. Preston, for appellee.

Before PRITCHARD, Circuit Judge, and BRAWLEY and DAYTON, District Judges.

BRAWLEY, District Judge. [1] This case comes up on appeal from the decree of the court below dismissing on final hearing a bill of complaint upon which a restraining order had been granted. The Baker-Whiteley Coal Company is a corporation of West Virginia owning a number of tug boats, and doing an extensive towing business with steamship lines trading to the port of Baltimore. It does a considerable business in supplying the steamships handled by it with bunker coal for their own consumption, which coal is bought from owners of mines on the line of the defendant company, and delivered by the railroad at the Curtis Bay pier. The defendant is a railroad company, a Maryland corporation, engaged in interstate commerce. The complainant, about the middle of June, 1908, had a contract with the owners or charterers of the Norwegian steamship Horda to tow her to the pier and to load her bunkers with coal, and the steamship was taken to the Curtis Bay coal pier by one of the complainant's tugs. The defendant refused to allow the Horda to make her lines fast to the pier, cast off those lines when they were made fast, and pushed the steamer off into the stream. This was in pursuance of an order of the defendant company, which was as follows:

"The Baltimore & Ohio Railroad Company.

"On and after June 15, 1908, docking and undocking of all classes of vessels at this company's coal pier, Curtis Bay, must be done by the tugs of Capt. R. M. Spedden.     By O. H. Hobbs, Superintendent."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The bill of complaint was filed June 19, 1908, a preliminary injunction was prayed, and a restraining order passed, preventing the railroad company from putting this order into effect. The defendant company answered, testimony was taken, and upon final hearing the court below decreed, February 9, 1910, that the restraining order be rescinded and annulled, and the bill of complaint dismissed, and the case is here upon appeal from that decree.

Prior to 1900 coal brought to Baltimore by the defendant company was delivered by the railroad either at its own pier at Locust Point, or at various private piers owned by shippers and dealers in coal. Baltimore has long had a large trade in coal, and most of it is brought by the defendant company. The Curtis Bay coal pier was constructed about the year last named. It is about 800 feet long and about 60 feet wide, extending out into the navigable waters of the bay. To facilitate the business the United States government spent a considerable sum of money in dredging a deep channel from the main ship channel to a point a short distance from the pier, where, in part from natural causes, and in part from the dredging done by the railroad, there was a sufficient depth of water at the pier, and it appears from the testimony that practically all of the coal brought to Baltimore by the defendant company and intended for transshipment by water to points beyond the capes of the Chesapeake is now and has since the year 1901 been delivered at the Curtis Bay coal pier. The Curtis Bay coal pier is named in the freight tariffs of the defendant company filed with the Interstate Commerce Commission as a station of the railroad company, which company does not undertake to further transport coal brought by it to said pier, nor enter into contracts with the owners of vessels for the transportation of coal beyond the said Curtis Bay coal pier, but it undertakes to deliver all coal which is shipped over its road under a bill of lading designating said pier as the place to which said coal is to be carried, upon the arrival of said coal at said pier, to whatever vessel or vessels the shippers or consignees of the same may designate. The testimony shows that when the pier was first opened, five or six tug boat owners competed for the business of docking and undocking vessels at the pier. The railroad company from the beginning had some arrangement with R. M. Spedden for the docking and undocking of vessels there. The exact terms of this contract do not appear in the record, but there is testimony tending to show that from the beginning the officials of the railroad company adopted a policy of throwing obstacles in the way of some of the owners of tug boats, the result being that for several years prior to the commencement of the proceedings in this case only two tug boat owners have ever docked and undocked vessels at this pier, one of them being Spedden, and the other the complainant here; Spedden having practically a monopoly of the docking and undocking of sailing and other craft not propelled by steam, and the complainant having a large business in the docking and undocking of steamships. The complainant company had been in the towing business for many years. It had powerful and well equipped tugs, and had built up a large and prosperous business. It had been in the habit annually for many years of

making contracts with different steamship lines trading to the port of Baltimore. By these contracts it agreed to do all the towage required by these steamship lines in and about the harbor of Baltimore, including all docking and undocking of steamers. It met these steamships on arrival, did many small services such as putting their officers and crews on and off ships, for all of which they charged a definitely fixed sum. Its towage business, amounting to from $90,000 to $100,-000 a year, is from 50 to 60 per cent. of all the towage business in Baltimore harbor. Its receipts for the work of docking and undocking steamers at the Curtis Bay coal pier amounts to something over $7,000 a year, and this business seems to have been done with skill and energy. It appears from the testimony that for some years prior to 1908 the officials of the railroad in charge of the operations at the pier were dissatisfied with existing conditions, and desired to correct them. They claimed that delays in docking and undocking of vessels limited the capacity of the pier, created confusion and delay at the pier and yards, and prevented quick dispatch. On the part of the complainant testimony was offered tending to show that such delays as were proved were not properly imputable to it. An examination and careful consideration of all the testimony on both sides fails to convince us that the complainant is properly chargeable with dereliction in the docking and undocking of vessels, or fault as to any preventable delays. The railroad company would be clearly within its right in making all proper regulations for the use of this pier. It could provide for the time and method of docking and undocking vessels, and make charges for demurrage in all cases where delays occured from inefficiency or other hindrances to the most rapid and economical use of its pier. It could have reserved the Curtis Bay pier for its own exclusive use, or for the use of such special transportation lines with which it made contracts for transshipment, as was the case in Louisville & Nashville Railroad Co. v. West Coast Company, 198 U. S. 494, 25 Sup. Ct. 745, 49 L. Ed. 1135. It could have constructed a wharf for its private use, as was decided in Weems Steamboat Company v. Peoples Company, 214 U. S. 345, 29 Sup. Ct. 661, 53 L. Ed. 1024. These two cases are cited in the opinion of the learned judge below, but the principles which should govern the use of the Curtis Bay pier differ entirely from those in the two cases cited, in neither of which was the wharf held out as a public wharf. In the agreed statement of facts and in the testimony this wharf is held out as a station of the defendant company, which made and published rates to it as to an ordinary railway freight station. In every sense it was a public terminal station for the delivery of coal to the consignees of all vessels which would come there for it. In the tariff schedules which appear in the record as exhibits there is no notice or reservation of any regulation for the exclusive handling of any coal delivered at that pier, but, on the contrary, "it undertakes to deliver all coal which is shipped over its road under a bill of lading designating said pier as the place to which said coal is to be carried upon the arrival of said coal at said pier to whatever vessel or vessels the shippers or consignees of the said coal may designate." The principles of law, therefore, applicable must be those which govern in the case

of an ordinary railway freight station. The real reasons which seem to have led to the adoption of the rule which gives rise to this controversy seem to be these: The Curtis Bay pier is beyond the jurisdiction of the city fire boat, and it is greatly to the advantage of the owner of the pier that it should have a tug constantly at hand for the prevention of fires. Such a tug is also needed for the breaking of ice in severe seasons, and it is greatly to the convenience of the pier owner that a tug should be always there. The ordinary tug boat which docks a vessel does not usually remain at the pier while the vessel is being loaded. It goes back to the city and seeks other employment, communication with it is not always prompt, and delays are thereby occasioned. Obviously it is of advantage to the owners of the pier to have a tug boat constantly at their command, and it appears from the testimony that in the contract with Spedden prior to 1908 it was stipulated that he shuld have a tug boat always at the pier, and it also appears that he kept a tug there, but that it was not an efficient one, and one of the witnesses in the employ of the defendant company stated:

"That Capt. Spedden could not keep a sufficiently large boat there because the business did not justify him to do so, and we had to do something else; either we would have to do the towing ourselves, or we would have to give it to one concern that had a good equipment."

This is probably the explanation of the reasons for the rule in question, and that it was an advantage and convenience to the railroad company to have an efficient tug boat always at hand must be conceded. It may also be conceded that the railroad company would have had the right to hire such a tug and include the expense of it as part of its terminal charges. Whether it can secure such advantage by the exclusive contract with Spedden, and at the expense of complainant, by excluding it from all participation in a business which it had built up and long enjoyed, is another question.

Some point is made in the argument that the contract with Spedden was not the result of fair competition. We cannot say that the testimony supports the inference that there was a preconceived intention on the part of the railroad company to give the contract to Spedden in any event. This is of no consequence, for if it had the right to make an exclusive contract, the method by which it accomplished it is immaterial, nor do we deem it necessary to consider in detail the controverted question whether the new regulation results in increased cost to vessels doing business at the port of Baltimore. The cost of docking and undocking merely has not been increased. That it is of great convenience to owners of steamships to have contracts with only one firm of tug boat owners to do all the work required for ships is obvious and it may be that, if such firm had charge of all the towing of the vessels while in port, there might be some saving; but the cost of a change from the old to the new condition is a matter that concerns mainly the shippers and consignees of the cargoes of coal, and they are not here to complain. The rule requiring every vessel taking coal at this pier to employ Spedden's tug has a tendency to give him a monopoly, which

may be most hurtful to the public interest. The railroad company may fix a maximum rate of charges for the docking and undocking of vessels, but it cannot effectively enforce the payment of such maximum rates. Spedden may give rebates upon such maximum charges for the securing of the other towage business, and the monopoly at this pier gives him an unfair advantage over his competitors, furnishes a leverage by which he can take away the towing business of his rivals. Free competition in the docking and undocking of vessels would more effectively prevent the establishing of an abhorent system of rebates than the fixing of maximum charges for such services. We need not pursue this line of discussion, as it might lead farther than is required for a decision of the precise question before us.

It is well established that the tracks and stations of railroad companies continue to be private property, although devoted to public uses, and that they may make such rules and regulations for the use thereof as may be reasonably necessary and suitable for the accommodation of passengers and shippers, and cannot be restrained from using it to the best advantage of itself and of the public. A wharf or pier devoted to the public uses, as was the Curtis Bay pier, is a public station for the shipment of coal, and the railroad company is entirely within its rights in making rules and regulations for its use by shippers and consignees and their vessels; and inasmuch as in present conditions tugs are necessary for the docking and undocking of vessels, the owners of a pier may make such reasonable rules and regulations as to the time and manner of such use as may be necessary. It may prescribe how and when the pier shall be approached, and charge demurrage for any delays which may be injurious to its business. As its structure is liable to injury by the inefficient handling of vessels placed alongside of it, it may prescribe that none but tugs of power proportionate to the size of the vessels handled should be allowed to use it, but the complaint here is not as to the reasonableness of the regulations for the use of the pier, but of the rule which excludes from any use of it whatever, except by the tugs of a single owner; in fact the complainant here is not seeking to use the pier at all, the immediate occasion of this litigation being that a steamship which had the right to receive a cargo of coal at the pier was not allowed to be moored alongside of it, because it was brought there by the complainant's tug. Having a contract for the towing of such steamship, it was not allowed to use the public navigable waters of the United States near the pier for the purpose of performing its contract.

In support of this rule the argument of the appellee here is that tug boats are not within the class to whom it owes any duty whatsoever, and, while conceding that it is necessary that patrons of the railroad should have their vessels docked by a tug boat, the railroad has the right to choose the particular tug boat, so long as the service rendered by that tug is adequate, and sanction for the rule is sought in the Express cases, 117 U. S. 1, 6 Sup. Ct. 542, 628, 29 L. Ed. 791, and the Pullman Cases, 139 U. S. 59, 11 Sup. Ct. 489, 35 L. Ed. 69. The following citation from the case first named is in the brief:

"So long as the public are served to their reasonable satisfaction, it is a matter of no importance who serves them. The railroad performs its whole duty to the public at large and to each individual when it affords the public all reasonable express accommodations. If this is done the railroad owes no duty to the public as to the particular agencies it shall select for that purpose. The public require the carriage, but the company may choose its own appropriate means of carriage, always provided they are such as to insure reasonable promptness and security."

The question in both those cases involves the use of the actual property of the railroad company, its tracks and stations, and the decision in the Express Cases was that railroad companies are not required to transport the traffic of independent express companies over their lines, or to furnish them equal facilities for doing an express business upon their passenger trains.

"The real question," says the court, on page 20 of 117 U. S., on page 552 of 6 Sup. Ct. (29 L. Ed. 791) of the opinion, "is not whether the railroad companies are authorized by law to do an express business themselves; nor whether they must carry express matter for the public on their passenger trains in the immediate charge of some person especially appointed for that purpose, nor whether they shall carry express freights for express companies as they carry like freights for the general public, but whether it is their duty to furnish the Adams Company or the Southern Company facilities for doing an express business upon their roads the same in all respects as those they provide for themselves or afford any other express company."

In the Pullman Car Cases it was decided that it was the duty of the railroad company as the carrier of passengers to make suitable provision for their comfort and safety, that it was a matter of indifference to the public who owned the drawing-room or sleeping cars so long as it was supplied with the requisite number, and, instead of furnishing its own cars, as it might have done, it was within its right to employ the Pullman Company, whose special business it was to provide cars of that character, to supply as many as were necessary to meet the requirements of travel.

The principles established in these cases do not seem to us to touch the real issue here. They relate to the use by the railroads of their own property. In the nature of things railroads are entitled to an exclusive use of their tracks. In the case before us the complainant claims no right to any use of the defendant's property. His tugs do not even touch that property. They approach it upon the public navigable waters, which he is as free to use as is the public free to use the public streets in approaching the public freight stations for the delivery there of merchandise for transportation. The exclusive profits legislatively granted by most of the states to corporations for the building and operation of railroads are of necessity monopolies, for the transportation of passengers and freight, upon a fixed metallic rail, the substitution of steam for horse power, and the large expenditures necessary required the granting of exclusive privileges, while the efficient handling of the traffic necessitates the control by the railroad companies of all the operations directed to that end, where a divided control of locomotive power was found inadmissible, from the experience in the early years of railroads, where they were considered more as public highways. Such monopolies are granted because it is believed that

the public receives equivalent benefits, and the exclusive powers granted are applicable to those privileges only with which there is no available competition, for the very nature of the mode of conveyance forbids free competition. It was for a time a controverted question whether the monopoly could be extended to what the courts have called "the accessorial business," that is, the business of collecting freights at the doors of consignors, and making deliveries at the doors of consignees. Chief Justice Erle in England long maintained that a railroad company as a recompense for its large outlays had the legal right not only to a monopoly of the carriage of goods upon the line of the road itself, but also the accessorial carriage performable off its line. He stood almost alone in this opinion for many years, but after a full consideration both in the Exchequer Chamber and in the House of Lords this opinion was definitely rejected. We are not concerned here with this question particularly, as the railroad company is not claiming the right to this accessorial business, but, conceding the rightfulness of such claim, there is no reason why it should be monopolized. Such a monopoly was permitted in Louisville & Nashville Railroad Case, 198 U. S., 25 Sup. Ct., 49 L. Ed. already referred to, but the ground upon which that decision rests is that the wharf there in question was not a public station or terminal, the railroad company published no rates to the wharf, and it was not held out by the company owning it as a public wharf. Monopolies are void by the common law as discouraging labor and industry, and being against the freedom of trade. While tolerated and sanctioned by legislative grants within definite limitations, they are never permitted to be extended beyond the limits which necessitate them. They depend wholly upon this necessity, and cannot be extended beyond this exigency. As to all accessorial business, there is no such necessity, and if the railroads as common carriers cannot monopolize it for their own profit, can they promote the monopoly of it by any one else, or give preferential advantages for conducting it to any other person? That is the precise question here, or rather, the question is: Can the railroad company, under the guise of regulations for the use of its wharf, limit the right to approach it to a single person, give to him the monopoly of the free and navigable waters of the United States, so that no vessel seeking a cargo of coal at this public wharf can approach it or depart from it unless carried to or from it by the tugs of one person? That a railroad company has the right to keep a pier for its own use, and for the use of·such transportation lines as have contracts with it for transshipment, cannot be denied, provided it affords to the public reasonable facilities elsewhere at equal rates for the receipt of coal shipped over its road to Baltimore to be there transshipped; but this it not such a pier. By the agreed statement of facts found in the record (pages 50, 51) the Curtis Bay pier is referred to as "a station of said respondent," and it undertakes to deliver all coal which is shipped over its road under a bill of lading designating said pier as the place to which said coal is to be shipped, upon the arrival of said coal at said pier, to whatever vessel or vessels the shippers or consignees of the said coal may designate.

"As a railroad company, the defendant owes a duty to the public to operate its railway and maintain stations for the convenience of all who require transportation over it. It cannot with due regard to the character of its line as a quasi public highway interfere with the coming or going of its patrons to or from any of its stations by whatsoever vessels or vehicles may be employed for the purpose; nor can any vessel or vehicle offering to serve the public by carrying passengers or freight to and from a railway station be discriminated against by being excluded from sharing privileges allowed to others without depriving the people in general of conveniences and facilities which they have a right to enjoy." Judge Hanford in Oregon Short Line & U. N. R. Co. v. Ilwaco R. & Nav. Co. (C. C.) 51 Fed. 612.

"Undoubtedly the mooring of vessels at public wharves is a well recognized right, and ought to be protected by the law as that of navigation itself." Judge Acheson in the St. Lawrence (D. C.) 19 Fed. 330.

An instructive discussion of the rights and duties of railroad companies with respect to accessorial business may be found in the opinion of Judge Cadwalader in the case of Camblos v. R. R. Co., 4 Fed. Cas. 1104 et seq., where, among other things, it is said:

"Conceding the rightfulness of such accessorial business beyond the rails, there can be no reason that it should be monopolized. * * * A railroad company, as it cannot encounter competition upon the rails, may have consequent inseparable advantages in conducting the accessorial business. * * * This gives peculiar force to the reasons that the company should be restrained in the latter business from assuming preferential facilities to itself or extending them to any one else. Railroad companies have in this respect an immense power, whose abuse cannot easily be prevented. On all questions under this head, therefore, to guard against the danger of encroachment on the rights of the public the charters of the companies are construed strictly against themselves and liberally in favor of the public. * * * Arbitrary discrimination is of course illegal, and so is discrimination for the advantage or disadvantage of one person or of a select few. There can be no abatement for the advantage, direct or indirect, of the company itself, or of its managers or officers or agents or servants or friends."

The case chiefly relied on in support of the rule is Donovan v. Pennsylvania Co., 199 U. S. 279, 26 Sup. Ct. 91, 50 L. Ed. 192, and demands critical examination. It came before the Supreme Court on a certiorari to the Circuit Court of Appeals of the Seventh Circuit. The Pennsylvania Company was the owner in Chicago of a passenger station, and had made a contract with the Parmalee Transfer Company, under which two agents of the transfer company are stationed within the depot building to solicit the custom of passengers. The appellants, who were hackmen, continuously asserted the right, over appellee's repeated objections, to have two of their number enter the building to solicit custom, and the main question in the case was as to the right of the hackmen to solicit business within the station over appellee's protest. The decision of the court, that although its functions are public, a railroad company holds the legal title to the property employed in the discharge of its duties, and to that end may make reasonable rules and regulations for the use of its property, consistent with the purposes for which it is created, and may make arrangements with and grant special privileges to a single concern to supply its passengers arriving at its terminals with hacks and cabs, and is not bound to accord similar privileges to other persons, is not and cannot be controverted. The court held that:

"Its property is to be deemed in every legal sense private property as between it and those of the general public who have no occasion to use it for purposes of transportation; that it was its right, if not its legal duty, to erect and maintain a passenger station, and to so manage it as to subserve primarily the convenience, comfort, and safety of passengers and wants of shippers. It was therefore its duty to see to it that passengers were not annoyed, disturbed, or obstructed in the use either of its station house or of the grounds over which said passengers, whether arriving or departing, would pass; that it was easy to see how in a great city, and in a constantly crowded railway station, such an arrangement as that complained of might promote the comfort and convenience of passengers arriving and departing, as well as the efficient conduct of the company's business; that the hackmen only sought to use the property of the railroad company to make profit for themselves, and that such hackmen, in no wise connected with the railroad company, cannot of right, and against the objections of the company, go upon its ground or into its station or cars for the purpose simply of soliciting the custom of passengers."

No such right is claimed by the complainant in this case. He does not ask to be allowed to go upon the pier or other property of the defendant, or to make any use of it for the purpose of soliciting business, or otherwise, as claimed by the hackmen, and it follows that the decision upon the main branch of that case does not touch the rights claimed here; but there is a branch of the case which is relevant, and that relates to so much of the injunction of the court below as restrained the appellants—

"from congregating upon the sidewalk in front of, adjacent to, or about the entrances of appellee's passenger station in Chicago, and from there soliciting the custom of passengers, so as to interfere with the ingress and egress of passengers and employés."

It will be observed that the words above quoted are carefully guarded. They are from the decree of the Circuit Court of Appeals, which modified the injunction of the court below that enjoined the appellants "from congregating on the sidewalk in front of, adjacent to, or about the entrances, and there soliciting the custom of passengers." "This injunction," said the Court of Appeals, "was too broad; the congregating that may be restrained in this suit is only such as interferes with the ingress and egress of passengers and employés"; and, inasmuch as the decree by its terms was not limited to protecting appellee's private right of property, it was ordered that it should be modified. The opinion of the Circuit Court of Appeals appears in Donovan v. Pennsylvania Co., 120 Fed. 215, and on page 219, 57 C. C. A. 362, on page 366 (61 L. R. A. 140), the relevant facts are thus stated:

"The main entrance to the station comprises three doorways, each five feet wide. Most of the thirty-odd thousand passengers a day go through this entrance. The building abuts upon the street. In the street, in front of the building, some distance from the entrance, is the hack stand established by the city ordinance. From 10 to 20 hackmen throughout each day have persisted in congregating about the entrance, to the material interference with the ingress and egress of passengers and railroad employés. The number has been swelled by the presence of baggagemen, hotel runners, and Parmalee agents. The Parmalee Company has no greater rights in the street and on the sidewalk than the others, and appellee has not undertaken to give it any. Every one who has an existing contract to deliver or receive a passenger has, through the passenger, the right of access and entry to serve the passenger. This the appellee concedes. The title and the right of control of the streets

for street purposes are in the city. If the streets are obstructed, the city should clear them. Appellee may not take ·upon itself the vindication of the city's or the public's rights, but to have a free and unobstructed entrance is a property right and easement appurtenant to the abutting realty."

It will be seen that neither in this opinion nor in the opinion of the Supreme Court is there any discussion of what are called "accessorial privileges," that is, the privilege of bringing passengers to or taking them from the station. The exclusion of the hackmen from the station itself is put upon the ground that the station is private property. The injunction, in so far as it affects the sidewalk and streets, rests upon the ground that the railroad company as owner of the station has an easement in the sidewalk and streets appurtenant to the abutting realty, and free and unobstructed entrance is a property right, and it is only such congregating there as interferes with the ingress and egress of passengers and employés that is enjoined. The right of hackmen to bring passengers to the station from the public streets is nowhere sought to be interfered with; on the contrary, it is asserted in the opinion of the Supreme Court:

"Licensed hackmen and cabmen, unless forbidden by valid local regulations, may within reasonable limits use the public sidewalk in prosecuting their calling, provided such use is not materially obstructive in its nature; that is, of such exclusive character as in a substantial sense to prevent others from also using it upon equal terms for legitimate purposes. Generally speaking, public sidewalks and streets are for the use by all, upon equal terms, for any purpose consistent with the object for which such sidewalks and streets are established, subject, of course, to such valid regulations as may be prescribed by the constituted authorities for the public convenience; this to the end that as far as possible the rights of all may be conserved without undue discrimination."

And there is quoted from the opinion of Pennsylvania Company v. Chicago, 181 Ill. 289, 54 N. E. 825, 53 L. R. A. 223, as follows:

"The city has no power or authority to grant the exclusive use of its streets to any private person or for any private purposes."

Elsewhere in the opinion of the Supreme Court appears the following:

"A hackman in no wise connected with the railroad company cannot of right and against the objections of the company ·go upon its grounds or into its station or cars for the purpose simply of soliciting the custom of passengers, but of course passengers upon arriving at the station in whatever vehicle is entitled to have such facilities for his entering the company's depot as may be necessary. When, therefore, licensed hackmen and cabmen have at appropriate times placed their vehicles in the public streets next to the sidewalk in front of the company's passenger house, they did not violate the regulations established by the city council, nor, so far as the plaintiff is concerned, did they violate such regulations when, leaving their vehicles in the public streets at the appointed place, they stood near by them for a reasonable time, upon the sidewalk, awaiting the coming of passengers from the station house; but what they could not legally do—what the final decree properly forbade them to do—was to congregate upon the sidewalk in front of, adjacent to, or about the passenger house, so as to interfere with the ingress and egress of passengers."

In so far as attempt is made to justify the rule on the ground that it is necessary in order to prevent delays in the loading of vessels at the pier, we may repeat that such delays as occurred under the old

system are not proved to have been due to complainant, and other means to prevent such delays may readily be adopted. If it be true, as charged, and as seems not improbable, that the real reason for the adoption of the rule is the desire and interest of the railroad company to have a powerful tug always at the pier for various purposes of its own, such as protection from fire, the breaking of ice, for messenger service, and the like, it should hire and pay for such tug, and not seek to secure it under the guise of a regulation for the use of the pier. Much less can it, under the guise of regulations for the use of its own property, adopt a rule not of regulation, but of exclusion, which, in effect, forbids approach to the pier on the public navigable waters of the United States. The railroad company by public advertisement offers to deliver coal at this pier to whatever vessels the shippers or consignees of the coal may designate. The tug boat is the instrumentality by which the vessels approach the pier, and it therefore has the right of the vessel. The public waters are free to its use, as the public streets are for passengers and vehicles approaching a public station. It was so expressly held in the Donovan Case, for it is said that:

"Of course a passenger upon arriving at the station in whatever vehicle is entitled to have such facilities for his entering the company's depot as may be necessary."

And again:

"Passengers may therefore in their own right, as well as in right of the company, use the sidewalk in order to gain access to the depot grounds and station, or to reach the public street when leaving the station."

And in that case so much of the decree as related to the public streets and sidewalks was sustained, solely upon the ground that congregating in large numbers on the sidewalk tended to obstruct the free ingress and egress of passengers and employés. There is no attempt here to support this rule upon any such ground.

[2] Another point pressed in the argument needs only brief attention. It does not seem to have been made in the court below, or at least is not referred to in the opinion, that is, that complainant has no standing in court. It is not disputed that if this rule goes into operation a large and profitable business of the complainant is destroyed. This is a property right, which it is the duty of courts to protect. The complainant has through its contracts with the owners of vessels and consignees of coal a considerable property interest in their towage, and, as we have held, it has through these vessels the right of access and entry to the pier, which, like any other station of the railroad, is impressed with the public use, and open to all having contractual relations with the consignees of coal to be delivered there. The disregard of these rights to its injury gives complainant a standing in court which by a bill in equity seeks to prevent a multiplicity of suits and circuity of action.

The decree of the court below is reversed.

Reversed.