## CALF LEATHER TANNERS' ASS'N et al. v. MORGENTHAU, Secretary of the Treasury. *
### No. 6461.

United States Court of Appeals for the District of Columbia.

Argued Oct. 10, 1935.

Decided Nov. 11, 1935.

A. K. Shipe, of Washington, D. C., for appellants.

Leslie C. Garnett, U. S. Atty., and John J. Wilson and Henry A. Schweinhaut, Asst. U. S. Attys., all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

STEPHENS, Associate Justice.

Appeal from a judgment in the Supreme Court of the District of Columbia dismissing a petition for a writ of mandamus directing the Secretary of the

*Writ of certiorari denied 56 S. Ct. 536, 80 L. Ed. —.

Treasury to comply with paragraph 1530 (d) of section 1 of the Tariff Act of 1930, Public No. 361, approved June 17, 1930, 46 Stat. 666 (19 U.S.C.A. § 1001, par. 1530 (d), as construed by the United States Court of Customs and Patent Appeals in United States v. John B. Stetson Co., T.D. 46319, 63 Treas.Dec. 642.

This suit is here upon the pleadings. The appellants, as plaintiffs below, filed a petition, and an amended petition, praying for the issuance of a writ of mandamus against the appellee, as defendant below, and for a rule to show cause why such writ should not be issued. The appellee made answer to the petition and again to the amended petition. Appellants replied to the answer to the amended petition, and to this reply the appellee demurred. The trial court treated the demurrer as searching the record, and held that no cause of action was stated in the petition and amended petition. The appellants then elected to stand upon these pleadings, whereon the trial court dismissed them and discharged the rule to show cause.

The case for the appellants, as set forth in their pleadings, is this: The appellants, all citizens of the United States, are, except the Calf Leather Tanners' Association, American manufacturers, producers or wholesalers of leather; they tan and finish calf and kip leather, used principally in the manufacture of shoes and sundry leather goods. Their products compete with foreign importations of like kinds not made from American products. The appellant Calf Leather Tanners' Association is an association organized to foster the calf leather industry in the United States; all of the other appellants belong to it. The appellee is Secretary of the Treasury of the United States and as such is required to assess and collect customs duties on all duty-bearing imports. The Tariff Act of 1930 imposed a duty by paragraph 1530 (d), set out in full in the margin,[1] of 30 per cent. ad valorem upon leather of all kinds, "grained, printed, embossed, ornamented, or decorated, in any manner or to any extent * * * or by any other process (in addition to tanning) made into fancy leather." By paragraph 1530 (b) (4), 19 U.S.C.A. § 1001, par. 1530 (b) (4), set out in full in the margin,[2] it imposed a duty of 15 per cent. ad valorem upon "side upper leather, * * * patent leather, and leather made from calf or kip skins, rough, partly finished, or finished."

In July, 1930, there was submitted to the Secretary of the Treasury, i. e., to appellee's predecessor in office, under section 516[3] of Public No. 361 (19 U.S.C.A. § 1516), a request (made by the appellants, they assert, and this is herein assumed, though the record is not clear) for a ruling upon what kinds of leathers were properly dutiable at 30 per cent. ad valorem under paragraph 1530 (d), above.[4] Domestic tanners contended that all leathers enumerated in the paragraph, whether or not commercially known as fancy leather, were so dutiable. Shoe manufacturers on the contrary took the position that no leathers were dutiable under the paragraph at 30 per cent. unless they were commercially known as fancy leathers. The Secretary held that the latter was the correct view. T.D. 44213, 58 Treas.Dec. 160.

---

[1] (d) Leather of all kinds, grained, printed, embossed, ornamented, or decorated, in any manner or to any extent (including leather finished in gold, silver, aluminum, or like effects), or by any other process (in addition to tanning) made into fancy leather, and any of the foregoing cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear, all the foregoing by whatever name known, and to whatever use applied, 30 per centum ad valorem.

[2] (4) Side upper leather (including grains and splits), patent leather, and leather made from calf or kip skins, rough, partly finished, or finished, or cut or wholly or partly manufactured into up-

pers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear, 15 per centum ad valorem.

[3] This section, more particularly discussed under appellee's fourth point below, provides the procedure to be followed in obtaining information concerning the appraised value of, the classification of, and the rate of duty upon, imported merchandise, and in contesting such appraised value, classification, and rate.

[4] In the amended petition (R. 32) this request is described as having been filed pursuant to the provisions of section 516 (a), which has to do with complaints concerning the appraised value of imports. But the substance of the request as described in the amended petition indicates that it was filed under section 516 (b),

On August 21, 1930, the John B. Stetson Company, not a party to the suit at bar, made two entries of imported leather at the port of Philadelphia under the Tariff Act of 1930. They were classified by the collector for duty as grained sheepskin under paragraph 1530 (d), i. e., at 30 per cent. The importer filed protest, asserting at the hearing in the United States Customs Court that the goods were dutiable at 25 per cent. under paragraph 1530 (c) [5] of the act (19 U.S.C.A. § 1001, par. 1530 (c) as finished leather. This protest was sustained (John B. Stetson Co. v. United States, T.D. 45615, 61 Treas.Dec. 878), and the government appealed to the United States Court of Customs and Patent Appeals which, in United States v. John B. Stetson Co., T.D. 46319, 63 Treas.Dec. 642, reversed the trial court, thus holding the imports dutiable at 30 per cent. under paragraph 1530 (d).

It is asserted by the appellants that in the Stetson Case the government, in support of its position that the imports were dutiable under paragraph 1530 (d) at 30 per cent., contended that any leather which has been "boarded" [6] is "grained" and that any grained leather is fancy leather within the provisions of paragraph 1530 (d); and the appellants assert that the Stetson Case, not having been appealed from and the time within which an appeal can be prosecuted having expired, establishes what the government contended.

By letters of July 7 and August 26, 1933, directed by the Collector of Customs in New York City to the Commissioner of Customs, the Treasury Department was called upon to rule, under the Stetson Case, as to the proper classification of "English leather lining sides," and briefs were filed on the question.[7] Domestic tanners asserted that under the Stetson Case any leather which has been boarded is grained leather and therefore subject to duty under paragraph 1530 (d) at 30 per cent., whereas importers contended that leather is not "grained" as that term is used in paragraph 1530 (d) merely because it has been slightly boarded so as to render it softer and more pliable and thus more desirable for use in the manufacture of shoes. In a letter, directed to the Collector of Customs in New York City, stating the question and commenting upon the course of reasoning in the Stetson Case, the Commissioner of Customs, on October 25, 1933, ruled as follows:

"The Bureau does not read the court's decision as holding that merely because a leather has been boarded it is ipso facto a grained leather, or that leather which has been boarded for the temporary purpose of making it more pliable so as to be more easily used in the manufacture of shoes is necessarily a grained leather. In this connection it is noted that the Court in its decision stated that the operation of 'boarding' was to produce a surface finish upon the leather which would otherwise not have been there.

"The Bureau is of the opinion, therefore, that only leather upon which a clearly perceptible grain has been produced by some process of manipulation, should, under the court's decision, be classified under paragraph 1530 (d) as a grained leather, and that leather, such as English leather lining sides, boarded for the purpose of softening it and facilitating its further manufacture, is not so dutiable by reason of a slight change in the surface finish not producing such a grain. You will be governed accordingly."

In addition to all set out above, there are, in the appellants' pleadings, allegations of damage by reason of the alleged refusal of the Secretary, appellee, to impose a duty upon grained leather according to the statute and the Stetson Case, and the consequent competitive importation of foreign-made products; and the assertions thus made, as above set forth, constitute the case of appellants for a writ of mandamus against the Secretary.

---

which has to do with complaints as to the classification of, and duty upon, imports, and it will be treated as if so filed.

[5] (c) Leather (except leather provided for in subparagraph (d) of this paragraph), made from hides or skins of animals (including fish, reptiles, and birds, but not including cattle of the bovine species), in the rough, in the white, crust, or russet, partly finished, or finished, 25 per centum ad valorem.

[6] A process more particularly referred to below, consisting of folding a hide with the wool side in and passing a cork surfaced board over the outside of the folded hide.

[7] These letters and briefs do not themselves appear in the record. They are referred to in Exhibit A (R. 39).

The appellants contend that the instructions of the Bureau of Customs of the Treasury Department in the letter of October 25, 1933, are palpably violative of the decision of the United States Court of Customs and Patent ·Appeals in the Stetson Case interpreting paragraph 1530 (d) of the Tariff Act. They assert that under that decision and act it is the clear and purely ministerial duty of the Secretary to instruct all customs officials to impose and collect a duty of 30 per cent. upon " * * * all boarded or grained calf and kip leathers in accordance with * * *" paragraph 1530 (d) as construed in the Stetson Case, or in the alternative to instruct them to impose and collect such duty upon " * * * all leather, which after tanning, has been grained or embellished in any manner, or to any extent, whether by 'boarding' by hand or machine, or by any other process * * *," or to amend the instructions issued by the Bureau of Customs so as to instruct all customs officials that " * * * all leathers, in which the actual grain of the skin is brought out, accentuated and raised by a process of handboarding or any other process producing such effect is grained leather and dutiable at 30% as fancy leather * * *" within paragraph 1530 (d); and the appellants pray that a writ of mandamus issue in the terms of one of the alternatives above set forth.

Very briefly stated, the appellants' contention is that under the statute and the Stetson Case any leather which has been "boarded" is "grained" and therefore dutiable at 30 per cent., and that it is hence the plain duty of the Secretary of the Treasury so to instruct all customs officials. The letter of the Commissioner of Customs of October 25, 1933, ruling, in effect, that leather which has been "boarded" but only for the purpose of softening and facilitating its further manufacture, is not dutiable at 30 per cent. by reason of a slight change in the surface finish not producing a clearly perceptible grain, is, say the appellants, a plain violation of the statute as construed in the Stetson Case and a departure from the plain duty of the Secretary.

To this case for the appellants, the appellee asserts the following: First. The appellants have not a sufficient legal interest, nor have they suffered such legal injury as to permit them to maintain their suit. Second. The law confers the power to liquidate upon collectors of customs only and not upon the appellee. Third. The duties of the appellee with respect to the subject-matter of the appellants' case are discretionary and therefore not controllable by mandamus. Fourth. The appellants have an adequate and sole remedy under section 516 (b) of the Tariff Act of 1930 (19 U.S.C.A. § 1516 (b) and they have not pursued the same. Fifth. This court is without jurisdiction of the subject-matter of this suit. Sixth. The proceeding is a suit against the United States, which has not been named and which cannot be named because it has not consented to be sued.

The fifth point, that the court has no jurisdiction over the subject-matter of the suit, was not argued in terms by the appellee either orally or in the brief. It is apparently intended only to assert in another way that the facts set out in the appellants' pleadings constitute no cause of action, and it will be considered in that sense only and not as if it were intended to assert that this court has no power to hear this class of case, i. e., a mandamus case.

Appellee's third ·and fourth points will be considered first. The third point: Did the duty of the Secretary under the statute and the Stetson Case involve the exercise of discretion, or was the duty plain and ·the letter of October 25, 1933, a violation thereof?

Whatever may have been the contention of the government in the Court of Customs and Patent Appeals, that court, in reaching the conclusion that the imports in the Stetson Case were dutiable at 30 per cent. under paragraph 1530 (d), reasoned, and ruled as follows: At the outset it rejected the ancillary contention made by the importer that to come under paragraph 1530 (d) leather must not only be "grained, printed, embossed, ornamented, or decorated," but also known commercially as "fancy" leather. As above pointed out, that had been the ruling in T.D. 44213, 58 Treas.Dec. 160, upon the request submitted by the appellants to the Secretary. The important question, according to the court, was not whether the goods are known as "fancy," but whether they are properly known as "grained." Discussing this point, the court said that the record established no *commercial* designation and that it must there-

fore determine the state of the law and the record on the question of the *common* designation of the imported goods. The court held that the testimony in the record applicable to the exhibits in the case was of little value in determining the common meaning of the term "grained leather," but that it had disclosed the character and structure of the imported material itself. It had shown Exhibit 1 [8] to be finished sheepskin leather, russet in color, with a polished and attractive appearance, with its finished surface covered in large part with wavy broken lines. The skin with the hair removed made ready for tanning had been treated in a weak solution of sumac extracts at room temperature and then subjected to a process of boarding in one direction only. This process consisted of folding a hide with the wool side in and then passing a board with a cork surface over the outside of the folded hide, as if ironing. According to the testimony, this process brings out, accentuates, and raises the natural grain of the skin. Exhibit 2, also finished sheepskin leather of russet color, with a polished and attractive appearance, had its finished side covered with a vast number of small raised portions giving its surface a granular or pebbly appearance. It had been tanned in a strong solution at elevated temperatures which had resulted in a puckering or drawing of the hide, said to accentuate the natural grain, and it had then been boarded in four directions instead of one, as in the case of Exhibit 1. The court concluded that from the testimony two facts were shown: "First, the imported leather had been handboarded, that represented by Exhibit 1, once, and that represented by Exhibit 2, four times [i. e., in four directions as above stated]; second, this operation of boarding cuts up, accentuates, and pulls out the natural grain of the skin, and if such operation were not performed the natural grain of the skin would not be noticeable."

The court next had recourse to lexicographers as to the common meaning of the term "grained leather." For example, Funk & Wagnalls New Standard Dictionary, defining the verb "grain" in leather making as "to rub with a board to raise the grain or pattern * * *"; Webster's New International Dictionary, defining the adjective "grain" as "having a grain; divided into small particles or grains; having or showing a grain or granulated structure or surface; hence, rough." The court also looked to the lexicographers for the meaning of the word "boarding." Thus, Webster on the verb "board" as "to work or rub with a board, as in the process of making leather supple and giving it a granular appearance by means of a graining board"; The Dictionary of Leather Terminology upon the term "boarded leathers" as "sides or skins finished by folding with grain side in and rubbing the surface together under pressure of an instrument known as a handboard * * *." The court considered also other sources, as well as the meaning of the term "embossed leathers." The court said: "A consideration of these authorities, in view of the evidence, leads the mind to the conclusion that the imported leathers have been 'grained' within the common meaning of that word. The operation of 'boarding' was to produce a surface finish upon the leather which would otherwise not have been there."

This detailed description of the course of reasoning of the court in the Stetson Case has been set out in order that it may be made apparent herein whether the Secretary, in ruling as he did by virtue of the Bureau of Customs letter of October 25th, violated a plain duty, as alleged by the appellants, or exercised a proper discretion.

We are of the view that in ruling as he did in the Bureau of Customs letter, the Secretary of the Treasury was exercising a necessary and proper discretion, and that to issue the writ of mandamus in the terms sought would be for the court to assume to control that discretion. The question presented to the Bureau was this: Is leather such as English leather lining sides, boarded for the purpose of softening it and of facilitating its further manufacture, with only a slight change in the surface finish not producing a clearly perceptible grain, dutiable at 30 per cent. under paragraph 1530 (d) and the Stetson Case? The appellants assert that such leather is so clearly covered by the statute and the case that the duty of the Secretary so to classify it was palpably ministerial.

---

[8] The two entries which were the subject of the controversy in the Stetson Case were therein designated Exhibits 1 and 2.

Apparently using the terms "boarded" and "grained" interchangeably, appellants contend that all leather which has been subjected to the process of boarding, whether or not that process has resulted in a perceptible grain, is covered by the statute as interpreted by the decision. They particularly assert in support of their view that no such leather as English leather lining sides, the subject of the letter of October 25, was within the record in the Stetson Case. That fact is, in our view, the very fact which compels a conclusion contrary to that reached by the appellants, i. e., the conclusion that the Secretary, in classifying such leather, was obliged to exercise his judgment as to the meaning of the statute and the case. All that the Stetson Case actually held on its facts was that the two imports in question, having been subjected to a process called "boarding" with resultant wavy broken lines upon the finished surface of one, and a vast number of small raised portions, giving the surface a granular or pebbly appearance, upon the other, were "grained leather" within paragraph 1530 (d) and therefore dutiable at 30 per cent. Thus that case did not, either in terms or on its facts, rule upon the dutiability of leather subjected to the process of boarding only to the extent of making it more pliable and not to the extent of producing a perceptible grain. In order to determine the dutiability of that kind of leather, the Secretary was bound to reason in order to ascertain what the decision meant in respect of leather not boarded to the extent of producing a perceptible grain. It cannot be said that the Stetson Case so clearly covers that kind of leather as to make the application of the 30 per cent. duty to it a merely ministerial act. In view of the statement of the court in the Stetson Case that " * * * the operation of 'boarding' was to produce a surface finish upon the leather which would otherwise not have been there," and in view of the fact that in the Stetson Case the exhibits in the one instance had wavy broken lines thereon and in the other a granular or pebbly appearance, there is much to be said in favor of the conclusion of the Secretary, as evidenced in the letter of the Bureau of Customs, that the ruling in the Stetson Case cannot be said to include leathers boarded only so far as to cause them to be more pliable but not so far as to produce a clearly per-

ceptible grain. If the conclusion of the Secretary was sound, i. e., consistent with the statute as construed by the Stetson Case, the letter of instructions was not violative thereof, and he ought not be compelled, as the writ would, in effect, compel him, to withdraw it.

But it is not necessary to pass upon the soundness of the Secretary's conclusion, and we do not do so. All that it is necessary to determine here is whether the Secretary, under the statute and the Stetson Case, was fairly confronted with a problem invoking the exercise of his judgment and discretion, or whether the meaning of the statute and the case is so clear as to make the raising of a question by the Secretary capricious or arbitrary. To put the point otherwise and briefly: Do the statute and the Stetson Case so clearly impose a 30 per cent. duty upon all leathers which have been subjected to the process of boarding, whether or not the process has been carried so far as to produce a perceptible grain, that there was no question of any reasonable kind for the Secretary to pass upon thereunder? We think that that cannot be said, but that on the contrary the Secretary was necessarily called upon to construe and determine the meaning of the statute and the decision in respect of leathers not boarded sufficiently to produce a perceptible grain. The appellants assert in their reply brief that leather cannot be "boarded," however slightly, without producing a "grained leather," and refer to the fact that in the Stetson Case Exhibit 1 had been boarded but once [in one direction] and yet was held grained. But whether or not the process of boarding can be carried out in such manner or to such limited degree as to make leather more pliable but not perceptibly grained is a question of fact; and that question was not as such before the court in the Stetson Case and does not seem to us so plainly by inference determined therein in the negative as to make the Secretary's ruling in the affirmative in the letter of October 25th arbitrary.

It is of course settled that if a duty imposed by law is plain, an administrative officer must perform that duty and is subject to mandamus if he refuses. He cannot rely upon the mere necessity of reading a statute or decision in respect of its applicability to facts

before him and thereby capriciously, under the pretense of the exercise of discretion, avoid a plain duty. Wilbur v. United States ex rel. Krushnic, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445; Roberts v. United States, 176 U.S. 221, 20 S.Ct. 376, 44 L.Ed. 443. But the law is equally clear that where an exercise of judgment or discretion by an administrative officer is necessary in determining his duty, mandamus will not lie. Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809; Work v. United States ex rel. Rives, 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561; United States ex rel. Ness v. Fisher, 223 U.S. 683, 32 S.Ct. 356, 56 L.Ed. 610; United States ex rel. Riverside Oil Co. v. Hitchcock, 190 U.S. 316, 23 S.Ct. 698, 47 L.Ed. 1074; Decatur v. Paulding, 14 Pet. 497, 599 Appx., 10 L.Ed. 559, 609.

■ Appellee's fourth point: Have the appellants an adequate remedy at law, and, if so, did they pursue it? It is the view of this court that they have a sufficient remedy and that they did not pursue it. Section 516, paragraphs (b) and (c), 19 U.S.C.A. § 1516 (b, c), together with sections 501 (19 U.S.C.A. § 1501), and 515 (19 U.S.C.A. § 1515), of the Tariff Act under consideration, provide a complete administrative remedy for American manufacturers, producers, and wholesalers claiming to be injured through incorrect classification of, or imposition of duties upon, imported merchandise. This statute sets out in detail the · procedure which is to be followed in obtaining information concerning the classification of, and rate of duty upon, imported merchandise and the procedure to be followed in contesting such classification and rate. This procedure includes: The making of a request upon the Secretary of the Treasury for information as to the classification and rate; the filing of a complaint; a decision by the Secretary as to the correctness of the classification and rate; the publication of such decision and of notice that the classification and rate will be subject to the decision of the United States Customs Court in the event of protest; the filing of a protest by the dissatisfied complainant, upon information furnished by the Secretary as to entries and consignees; the giving of notice to the protestant upon liquidation of the first entry; the filing of a protest with the collector against particular entries; the suspension by the Secretary, pending decision in the United States Customs Court upon the protest, of the liquidation at all ports of all unliquidated entries; a hearing and decision by the United States Customs Court; and an appeal therefrom to the United States Court of Customs and Patent Appeals. The statute also provides that all entries shall be liquidated, or if already liquidated, shall, if necessary, be reliquidated, in conformity with the ultimate decision. This remedy provides a proper hearing, both trial and appellate, upon the very type of issue sought to be determined in this suit and before tribunals especially set up by the Congress for the determination of such issues. The provision for final liquidation in accordance with the ultimate decision is intended to protect the American manufacturer, producer, and wholesaler from competitive damage and seems adequate to that end.

■ The appellants did not pursue this remedy. After the ruling of the Secretary upon the request made by them as above described under section 516 (b), the appellants, so far as the record shows, abandoned the remedy of complaint and appeal available to them under the act. The John B. Stetson Company, not a party to this suit, and not appearing as an American manufacturer, producer, or wholesaler, but as an importer, originated and carried forward the proceedings resulting in the decisions of the United States Customs Court and the United States Court of Customs and Patent Appeals upon the applicability of paragraph 1530 (d) to the imports, Exhibits 1 and 2 in the Stetson Case. The law is settled that where another and adequate remedy exists, mandamus will not issue. United States ex rel. Frey v. Robertson, 61 App.D.C. 394, 63 F.(2d) 457; United States ex rel. Finley v. Hines, 58 App.D.C. 120, 25 F.(2d) 544; United States ex rel. Carroll Electric Co. v. McCarl, 56 App.D.C. 49, 8 F.(2d) 910.

It is not necessary to pass upon the assertion of appellee that the administrative remedy is sole.

The considerations above set forth are determinative of the case, and the court therefore finds it unnecessary to pass upon appellee's first, second, and sixth points.

The judgment of the trial court is affirmed.