**RED CANYON SHEEP CO. et al. v. ICKES, Secretary of Interior, et al.**

**No. 6991.**

United States Court of Appeals for the District of Columbia.

Decided May 27, 1938.

Frank K. Nebcker, of Washington, D. C., for appellant.

Nathan R. Margold, Solicitor, Department of the Interior, and Frederick Bernays Wiener and Jackson E. Price, Assistant Solicitors, Department of the Interior, for appellee.

Before GRONER, Chief Justice, and STEPHENS and MILLER, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from an order of the District Court of the United States for the District of Columbia dismissing, upon motion of the appellees, an amended bill of complaint. The bill was filed by the appellants Red Canyon Sheep Company, Willis R. Lovelace, and Frank Maxwell. They sought to enjoin the Secretary of the Interior and the Commissioner of the General Land Office from conveying to one C. M. Harvey certain lands located in what is known as Grazing District No. 4, established in New Mexico under the Taylor Grazing Act of June 28, 1934, 48 Stat. 1269, as amended by 49 Stat. 1976, 43 U.S.C.A. §§ 315–315p. From the allegations of the bill, which under the motion to dismiss must be taken to be true, and from certain enactments of the Congress of which we take judicial notice, the following appears:

More than 25 years before the filing of the bill the appellants entered into the sheep

business in New Mexico. Pursuant to the customs there prevailing, which had both local and Federal sanction, they drilled for water upon arid public lands, developed producing wells, secured title to the lands upon which the wells were developed, and commenced and continued to graze sheep upon the adjacent public domain. The sparsity of grass and forage in the region in question is such as to require from one to two sections of land to furnish sustenance for 100 sheep or 20 cattle during the grazing season; and only such persons as have wells for stock watering purposes can successfully make use of the public domain as a means of engaging in the stock industry, there being few springs or running streams of water thereon. The appellants, in developing their wells, expended large sums of money and they have built up a substantial livestock business.

In 1922 the Congress enacted the first of a series of statutes[1] authorizing the Secretary of the Interior to exchange public lands —whether located within or without the boundaries of a national forest—for privately owned lands located within such a forest, if the Secretary of Agriculture regarded it as desirable to include, within the publicly owned area, the private lands proposed for exchange. On August 15, 1929, C. M. Harvey, above named, was the owner of certain lands lying within the borders of the Lincoln National Forest in New Mexico; pursuant to the Act of February 7, 1929, he proposed to the Secretary of the Interior that an exchange be made of his lands for the very lands in New Mexico, located outside the Forest, upon which the appellants had, as above described, long been grazing their sheep. In 1932 the Department of the Interior suspended action on this proposal for exchange on the ground that it was not authorized by the then existing statutes. But in 1935 negotiations were renewed; the Department of the Interior then took the position that an Act of June 25, 1935, 49 Stat. 422, 16 U.S.C.A. § 486 note, had removed the obstacles to the exchange theretofore thought to exist, and, by an order of March 17, 1936, dismissed a protest which the appellants had filed against the exchange. It is the consummation of this exchange which the present suit seeks to restrain.

On June 28, 1934, the Taylor Grazing Act was passed, the pertinent provisions of which we set out later in this opinion. By that Act the Secretary of the Interior was authorized to create districts for grazing purposes upon the public domain, and to grant grazing permits to users of the range who complied with regulations to be laid down by the Secretary under the Act. In order to carry out the purposes of the Act, the President, by an Executive Order of November 26, 1934, No. 6910, withdrew from settlement, location, sale or entry all vacant, unreserved, and unappropriated public lands in New Mexico, pending further classification and determination of the most useful purposes to which they might be put in consideration of the provisions of the Act, and for conservation and development of national resources. In compliance with the provisions of the Act, on April 8, 1935, the Secretary of the Interior created a grazing district in New Mexico known as Grazing District No. 4, and this embraced, among others, the very lands which the appellants had been using for grazing purposes. The Secretary then granted to the appellants, pursuant to regulations issued under the Act, interim permits, called licenses, to graze their flocks over these very lands.[2] The issuance of these licenses was based—so it is alleged in the bill—upon a determination by proper officials of the Interior Department that each of the appellants was a person who could most economically make use of the lands in question for grazing purposes, and who was therefore entitled to priority under the regulations promulgated by the Department.

As a foundation for equitable relief the bill alleges that, if the proposed exchange is consummated, the appellants' privately owned land and the improvements thereon adjacent to the grazing district will become valueless, that the appellants will be unable to secure other public lands for grazing purposes, and that they will be compelled to retire from the sheep business in which they are now engaged. Further, it is alleged that the appellants have exhausted their administrative remedies and have no adequate remedy at law. The bill prays that an order be made restraining the appellees, and all persons claiming to act under their authority or control, from conveying or attempting to

---

[1] Act of March 20, 1922, 42 Stat. 465, and Act of Feb. 28, 1925, 43 Stat. 1090, 16 U.S.C.A. §§ 485, 486; Act of Feb. 7, 1929, 45 Stat. 1154. We refer to these hereafter in greater detail.

[2] These lands are described in the bill, and apparently were in the license, by section and township references.

convey any of the lands in Grazing District No. 4 in respect of which licenses have been issued to the appellants, and also from taking any action in derogation of the appellants' rights.

■ The appellees requested the trial court, and in their brief request this court, to take judicial notice of the proceedings in the Interior Department relating to the Harvey application for an exchange. This we may do. Cf. Santa Fé Pac. R. R. v. Payne, 50 App.D.C. 95, 267 F. 653 (1920); United States v. Brewer-Elliott Oil & Gas Co., 249 F. 609 (D.C.W.D.Okl.1918). The only fact thus added is that after an adverse opinion by the Solicitor of the Department in 1932 on the 1929 proposal for exchange, the Secretary of the Interior did not reject the application outright, but suspended action on it to await enabling legislation.

The appellees moved to dismiss the bill upon the grounds that the appellants lacked any interest to maintain the suit in that they had no vested interest in the lands and did not show themselves entitled to a patent; that Harvey had a valid existing right in the lands prior to the Executive Order of 1934, which right was saved from the operation of that order; that in any event the proposed exchange was legally authorized under a proper construction of the Act of 1935 above referred to; and finally, that the appellants had an adequate remedy by a suit at the situs of the land, if a patent were erroneously issued to Harvey. The motion of the appellees was granted by the trial court, and it is from the order granting the motion and dismissing the appellants' bill that the appeal is taken.

The appeal presents the following questions: I. Has a court of equity jurisdiction to protect the claimed rights of the appellants? II. If so, is the proposed transfer a wrongful invasion of those rights, so that equity jurisdiction may be invoked? Thereunder, had Harvey a valid and existing right which was saved from the operation of the Taylor Grazing Act and the Executive Order of 1934; and does the Act of June 25, 1935, authorize the transfer? III. If points I and II are answered in the affirmative, then should a court of equity in the circumstances of the instant case exercise its jurisdiction to protect the appellants? Thereunder, is the Act of June 25, 1935, so doubtful in meaning that the Secretary's discretion is not to be controlled by mandatory injunction; have the appellants an adequate remedy by a suit in New Mexico to

impress a trust upon the lands in question after consummation of the proposed exchange; and should the asserted power of the Secretary under the Taylor Grazing Act to reclassify the lands in a grazing district, drop them therefrom, and then effectuate a transfer, prevent the issuance of an injunction if the same is otherwise warranted?

I.

Has a court of equity jurisdiction to protect the claimed rights of the appellants? This question requires first an analysis of the Taylor Grazing Act and a determination of the nature of the appellants' rights thereunder. The pertinent provisions of the Act are as follows:

"Be it enacted . . . That in order to promote the highest use of the public lands pending its final disposal, the Secretary of the Interior is authorized, in his discretion, by order to establish grazing districts or additions thereto and/or to modify the boundaries thereof . . . . Nothing in this Act shall be construed in any way to diminish, restrict, or impair any right which has been heretofore or may be hereafter initiated under existing law validly affecting the public lands . . . .

"Sec. 2. The Secretary of the Interior shall make provision for the protection, administration, regulation, and improvement of such grazing districts as may be created under the authority of the foregoing section, and he shall make such rules and regulations and establish such service, enter into such cooperative agreements, and do any and all things necessary to accomplish the purposes of this Act and to insure the objects of such grazing districts . . . .

"Sec. 3. That the Secretary of the Interior is hereby authorized to issue or cause to be issued permits to graze livestock on such grazing districts to such bona fide settlers, residents, and other stock owners as under his rules and regulations are entitled to participate in the use of the range, upon the payment annually of reasonable fees in each case to be fixed or determined from time to time . . . . Preference shall be given in the issuance of grazing permits to those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights, as may be necessary to permit the proper use of lands, water or water rights owned, occupied, or leased by them, except that until July 1, 1935, no preference shall be given in the

issuance of such permits to any such owner, occupant, or settler, whose rights were acquired between January 1, 1934, and December 31, 1934, both dates inclusive, except that no permittee complying with the rules and regulations laid down by the Secretary of the Interior shall be denied the renewal of such permit, if such denial will impair the value of the grazing unit of the permittee, when such unit is pledged as security for any bona fide loan. Such permits shall be for a period of not more than ten years, subject to the preference right of the permittees to renewal in the discretion of the Secretary of the Interior, who shall specify from time to time numbers of stock and seasons of use. . . . nothing in this Act shall be construed or administered in any way to diminish or impair any right to the possession and use of water for mining, agriculture, manufacturing, or other purposes which has heretofore vested or accrued under existing law validly affecting the public lands or which may be hereafter initiated or acquired and maintained in accordance with such law. So far as consistent with the purposes and provisions of this Act, grazing privileges recognized and acknowledged shall be adequately safeguarded, but the creation of a grazing district or the issuance of a permit pursuant to the provisions of this Act shall not create any right, title, interest, or estate in or to the lands.

"Sec. 7. That the Secretary of the Interior is hereby authorized, in his discretion, to examine and classify any lands withdrawn or reserved by Executive Order of November 26, 1934 . . . or within a grazing district, which are more valuable or suitable . . . for any other use than for the use provided for under this Act, or proper for acquisition in satisfaction of any outstanding lien, exchange or script rights or land grant, and to open such lands to entry, selection, or location for disposal in accordance with such classification under applicable public-land laws . . . . Where such lands are located within grazing districts reasonable notice shall be given by the Secretary of the Interior to any grazing permittee of such lands . . . ." 43 U.S. C.A. §§ 315a, 315b, 315f.

To support the proposition that the Act and regulations grant *rights* to participation in the use of the range, the appellants point to the provision of Section 3, 43 U.S.C.A. § 315b "That the Secretary of the Interior is hereby authorized to issue . . . permits . . . ." and particularly to the word *authorized,* citing United States Sugar Equalization Board v. P. De Ronde & Co., 3 Cir., 7 F.2d 981 (1925), and West v. United States, 58 App.D.C. 329, 30 F.2d 739 (1929). The De Ronde Case holds that the word *authorized,* as used in a Joint Resolution of the Congress, 42 Stat. 1226, although diplomatic and permissive in form, was mandatory in fact. And the holding of the West Case, involving the provision of the Leasing Act of 1920, 30 U.S.C.A. § 221, "That the Secretary of the Interior is hereby authorized . . . to grant to any applicant qualified under this Act a prospecting permit . . . ." necessarily implies that the word *authorized* as there used is mandatory. In reply the appellees rely upon United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 51 S. Ct. 502, 75 L.Ed. 1148 (1931). That case involved the same provision of the Leasing Act as did the West Case and since in the Wilbur Case the Court refused to grant a writ of mandamus against the Secretary of the Interior to compel him to receive and to act upon applications for prospecting permits, the case impliedly overrules the West Case. Cf. Wann v. Ickes, 67 App. D.C. 291, 92 F.2d 215 (1937). The view of the Supreme Court in the Wilbur Case seems to be that the word *authorized* is not necessarily mandatory; and the Court's reasoning is inconsistent with the broad language of the Third Circuit in the De Ronde Case. But we think that none of these cases can be said to control the construction of the statute here involved. Whether *authorized* is to be construed as mandatory or permissive is a question which must be determined in the light of the context and purpose of the particular statute in which it is used.

We note that under the Taylor Grazing Act the Congress has vested discretion in the Secretary of the Interior to create grazing districts, to establish and modify the boundaries thereof, and from time to time to reclassify the lands therein for other purposes. And Section 3 of the Act does not expressly speak of *rights* to permits; it uses the terms *authorized* and *entitled.* Nevertheless, looking at the Act in the light of its purpose and of its provisions as a whole, we think that the Congress intended that under it livestock owners, who, with their flocks, have been for a substantial period of time *bona fide* occupants of certain parts of the public domain, and who are able to make the most

economic and beneficial use thereof because of their ownership of lands, water rights, and other necessary facilities, and who can thus bring themselves within a preferred class under the regulations by which the Secretary is authorized to implement in more detail the general policy of the Act, are entitled to grazing permits not exceeding ten years in duration, should the Secretary create a grazing district including that portion of the range which such livestock owners have been occupying. By this we do not mean to rule upon the question whether the Secretary may be required, by grazers who have been using a particular portion of the public domain, to establish a grazing district upon the lands so used. Conceivably under the Act the Secretary might in his discretion conclude that such lands were more valuable for homesteading or other public purposes than for grazing. But we do conclude that if the Secretary determines to set up a grazing district including lands upon which grazing has been going on, then those who have been grazing their livestock upon these lands and who bring themselves within a preferred class set up by the statute and regulations, are entitled as of right to permits as against others who do not possess the same facilities for economic and beneficial use of the range. Therefore in view of the allegations of the bill that the appellants have such adjacent land holdings, water rights, and other facilities as to bring them within a preferred class under the regulations, we are of the view that the interim licenses which have been temporarily issued to them must, under the Act, ripen into permits, provided that Grazing District No. 4, which has been set up so as to include the lands upon which the appellants have been running their sheep, continues to exist and to include such lands. The purpose of the Act seems to be at least twofold. First, it is designed to provide for the most beneficial use possible of the public range in the interest not only of the grazers themselves but also of the public at large. The livestock industry of the West is an important source of food supply for the people of the nation. In the arid regions of the West commercial success in the livestock industry requires that sheep and cattle be run upon the open range. This is a matter of common knowledge. Second, the Act is intended, in the interest of the stock growers themselves, to define their grazing rights and to protect those rights by regulation against interference.

Urging that the appellants have no rights which are the proper subject of equitable protection, the appellees rely upon such cases as Buford v. Houtz, 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890); Omaechevarria v. Idaho, 246 U.S. 343, 38 S.Ct. 323, 62 L.Ed. 763 (1918); Sparks v. Pierce, 115 U.S. 408, 6 S.Ct. 102, 29 L.Ed. 428 (1885); and The Yosemite Valley Case, 15 Wall. 77, 21 L.Ed. 82 (1872). They rely also upon Fisher v. Rule, 248 U.S. 314, 39 S.Ct. 122, 63 L.Ed. 263 (1919); Burke v. Southern Pac. R. R., 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527 (1914); and Campbell v. Weyerhaeuser, 8 Cir., 161 F. 332 (1908). We think none of these cases is determinative of the question under discussion. So far as here applicable, Buford v. Houtz and Omaechevarria v. Idaho indicate that the Supreme Court has not regarded customary grazing as the predicate of a vested right, either in grazing itself or in the lands upon which grazing was conducted. Similarly, Sparks v. Pierce and The Yosemite Valley Case hold that settlement and making improvements upon public lands confers no vested right in the lands. Fisher v. Rule, Burke v. Southern Pac. R. R., and Campbell v. Weyerhaeuser reflect the rule that one attacking a patent must succeed not upon the basis of the weakness of the patent but upon the showing of a better title in himself. All of these cases were decided before the enactment of the Taylor Grazing Act, and without reference to its possible effect. Moreover, the three cases last named do not answer the problem of the instant case, because each involved a situation where both parties claimed a right in the land itself or a right to require a patent to the land. The appellants in the instant case make no such claims.

Only a few cases in the state courts have considered whether livestock growers may resort to an injunction to protect grazing privileges. Bradshaw v. Burstedt, 50 Idaho 54, 293 P. 330 (1930); Allen v. Bailey, 91 Colo. 260, 14 P.2d 1087 (1932); George v. Chickasaw Land Co., 209 Ala. 648, 96 So. 781 (1923). Bradshaw v. Burstedt involved an Idaho statute which forbade, under criminal penalties, the grazing of sheep upon a range which had customarily been used as a cattle range. The plaintiffs were cattle men who sought to enjoin the grazing of sheep upon certain parts of the public domain which they alleged to have become cattle ranges under the statute because of 20 years prior use. They urged a liberal application of the

principle of injunctive relief "in the protection of pecuniary interest as distinguished from the older doctrine of protecting only . . . strictly property rights." The court denied the injunction. Its decision was based, however, largely upon the proposition that, while as a protective measure the State could exercise its police power to forbid the pasturing of sheep upon that portion of the public domain upon which cattle had theretofore been pastured, it could not, and by the statute did not attempt to grant any grazing rights in the public domain, since any such rights should come from the Federal government. In Allen v. Bailey a similar Colorado statute containing a specific provision for the granting of an injunction was held constitutional. In George v. Chickasaw Land Co., the court held that the interest of one who had been permitting his cattle to run at large upon the public domain was not sufficient to permit him to attack the constitutionality of a statute which prohibited this. The general premise of this case is like that of Buford v. Houtz, Omaechevarria v. Idaho, Sparks v. Pierce, and The Yosemite Valley Case, previously discussed.

We have found but one case in the Federal courts, Mumford v. Rock Springs Grazing Ass'n, 8 Cir., 261 F. 842 (1919), wherein injunctive relief against interference with grazing privileges upon the public domain was sought. There the plaintiffs alleged that the defendants were interfering with the plaintiffs' right of access to the public domain for grazing, and sought to restrain the defendants by injunction. The court held that the plaintiffs' proofs did not support their allegations, and accordingly denied the injunction. The opinion, however, assumes the existence of equity jurisdiction, and the court said therein:

"A different situation would be presented, here, if the record disclosed appellant and others similarly situated in a position where it was necessary to drive sheep, in the control of those in charge, over the lands of the appellee to reach the government lands, that a demand had been made upon the appellee for a reasonable way, and that appellee had failed or refused to designate such reasonable ways; such refusal being accompanied by proof of threats preventing appellant and others similarly situated from designating and using such a reasonable way." [261 F. at page 849]

These state and Federal cases also do not, we think, determine the question whether the appellants' rights are such as a court of equity has jurisdiction to protect. We recognize that the rights under the Taylor Grazing Act do not fall within the conventional category of vested rights in property. Yet, whether they be called rights, privileges, or bare licenses, or by whatever name, while they exist they are something of real value to the possessors and something which have their source in an enactment of the Congress. The jurisdiction of equity is flexible and should not be confined to rigid categories so that the granting of an injunction will depend upon nomenclature rather than upon substance. Pomeroy emphasizes this flexibility in stating the basis for equitable relief by injunction:

"Wherever a right exists or is created, by contract, by the ownership of property or otherwise, cognizable by law, a violation of that right will be prohibited, unless there are other considerations of policy or expediency which forbid a resort to this prohibitive remedy . . . . This jurisdiction of equity to prevent the commission of a wrong is, however, modified and restricted by considerations of expediency and convenience which confine its application to those cases in which the legal remedy is not full and adequate." [4 Pomeroy, Equity Jurisprudence (4th Ed.1918) § 1338]

There are well known situations where equitable protection is accorded to rights or interests which do not come within the category of vested interests in property. Among these are cases involving water rights, both the rights recognized under the rule of prior appropriation in the Western states and riparian rights. While the owner of a water right has a vested interest in that right, the right itself is something less than the full ownership of property because it is a right not to the corpus of the water but to the use of the water. Gunnison Irrigation Co. v. Gunnison Highland Canal Co., 52 Utah 347, 174 P. 852 (1918). For example, in Luxen v. Town of Rifle, 100 Colo. 540, 69 P.2d 251 (1937), the plaintiff and the defendant municipal corporation had, under a decree establishing priorities, equal rights in time and volume to the use of water in a creek. When the flow decreased in volume, the municipal corporation diverted the entire stream. The plaintiff was held entitled to enjoin its so doing. In Lambrix v. Frazier,

31 Idaho 382, 171 P. 1134 (1918), the plaintiffs had "a permit right" to the use of certain waters, and although they had completed diversion works and had substantially complied with the terms of the permit, they had not fully completed the process of appropriation. It was held that they were the owners of "an inchoate, contingent right" which might properly be protected by injunction against interference [the opinion does not disclose its nature] which would prevent "respondents from ripening their incipient interest into a complete appropriation." In Wallace v. City of Winfield, 96 Kan. 35, 149 P. 693 (1915), and Roberts v. Martin, 72 W.Va. 92, 77 S.E. 535 (1913), equitable protection against interference with riparian rights was recognized. In both cases the plaintiffs used the water to operate a mill, and the courts protected their rights to the natural flow of the stream against diversion by an upper riparian owner. See also Ulbricht v. Eufaula Water Co., 86 Ala. 587, 6 So. 78, 4 L.R.A.,N.S., 572, 11 Am.St.Rep. 72 (1889). Other cases are collected in a note to this case in 4 L.R.A. 573. Cf. Caretti v. Broring Building Co., 150 Md. 198, 132 A. 619, 46 A.L.R. 1 (1926) (injunction granted to riparian owner against pollution of stream).

Another instance in which equity will extend its protection to a right less than a vested right in the full sense of that term is illustrated by the case of Ainsworth v. Munoskong Hunting & Fishing Club, 153 Mich. 185, 116 N.W. 992, 17 L.R.A.,N.S., 1236, 126 Am.St.Rep. 474, 15 Ann.Cas. 706 (1908). There the complainants invoked the aid of equity to prevent interference with their right, as members of the general public, to hunt wild fowl upon the waters of the Great Lakes. The defendant was a private hunting club owning lands upon the shore. Its ownership, however, extended only to high or low water mark, where the fee of the State of Michigan to the waters of Lake Michigan commenced. The defendant claimed an exclusive right to hunt on the waters adjacent to its clubhouse and caused its servants and agents to interfere with the complainants who were hunting wild fowl, and the defendant publicly threatened that it would continue to prohibit and prevent all persons from hunting upon the waters in question. In that case, exactly as in this, the facts appeared in a bill of complaint and a demurrer raised the question whether a cause of action was stated which entitled the plaintiffs to equitable relief. The court held that such a cause of action was stated, and said:

"We think that this right is not merely a bare legal right, and interference with it causes no substantial injury. To many people such rights are highly prized, and their exercise valuable and necessary. To hold that such rights are not of sufficient dignity that interference therewith, and the prevention of their lawful exercise, and threatened continuance of such interference, will be taken cognizance of by the courts, and injury arising therefrom prevented, would be to deprive complainants of such rights, and to encourage wrongdoers in the assumption of the sovereign prerogative." [153 Mich. at page 191, 116 N.W. at page 994]

We think this case is apt because the right to hunt upon public waters bears a striking analogy to the right or privilege of grazing upon the public lands. Neither is an interest in the land itself, and both are subject to restriction or withdrawal, the one by game laws, and the other by laws in the interest of the protection of the public domain; yet both are of value to the persons possessing them. In Council v. Sanderlin, 183 N.C. 253, 111 S.E. 365, 32 A.L.R. 1527 (1922), the court granted an injunction against interference with a grantor's reserved right to hunt upon lands. This was of course, technically, a *profit à prendre*, but in the opinion the court nevertheless remarked:

"Not only is an injunction, as well as an action for damages, a proper remedy for the protection of an exclusive hunting privilege, but if a member of the public is denied his common right to hunt on public waters, the interference with this right may be enjoined. 9 R.C.L. 691, and cases there cited." [183 N.C. at page 258, 111 S.E. at page 368]

We rule that the valuable nature of the privilege to graze which arises in a licensee whose license will in the ordinary course of administration of the Taylor Grazing Act ripen into a permit, makes that privilege a proper subject of equitable protection against an illegal act. To hold that the appellants' rights are not of sufficient dignity to be entitled to equitable protection would be inconsistent with the cases discussing other analogous subjects of equitable protection and with the purposes of the Act itself.

However, the existence of equity jurisdiction to protect the appellants against

a wrongful act may be approached from another and independent point of view. Whatever may be said of the nature or quality of the right or privilege to graze upon the public domain, it is clear that the appellants' use of the public domain for grazing has not been, and is not now, unlawful. On the contrary, the appellants have been lawfully conducting a business of a valuable nature, and if the proposed transfer of the lands by the Secretary is illegal, this lawful business will be destroyed by an illegal act.

The protection by injunction of a lawful business against unlawful acts is a well recognized head of equity jurisdiction, and this whether or not the business depends upon a legally recognizable license, permit or franchise. Thus the Supreme Court remarked in International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293 (1918):

"The rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right [citations] and the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard property already acquired." [248 U.S. at page 236, 39 S.Ct. at page 71]

This may be illustrated by a number of cases which, although they differ from each other and from the instant case in respect of the nature of the illegal act involved, commonly recognize that the right to carry on a business without illegal interference causing irreparable damage is the subject of equitable protection by injunction. For example, in Barthet v. City of New Orleans, 24 F. 563 (C.C.E.D.La.1885), the complainant had erected, within the city limits of New Orleans, buildings for the purpose of carrying on the business of slaughtering cattle, and he was about to commence such business when a city ordinance was passed forbidding the maintenance of slaughterhouses unless permission was granted by the city council. The court held that the ordinance was unconstitutional and that the complainant was entitled to an injunction against its enforcement. In Evenson v. Spaulding, 9 Cir., 150 F. 517, 9 L.R.A.,N.S., 904 (1907), the complainants were lawfully engaged in the business of peddling buggies. Competitors caused their agents to interfere with and prevent the complainants' sales "by breaking in upon conversations,

interrupting sales, and making false representations as to the nature of the [complainants'] goods, and the manner in which they treated the purchasers thereof and other offensive acts." The competitors' purpose was not to sell goods, and thereby to interfere with the sales of the complainants, but by pursuing a policy of molestation to drive the complainants out of business. Equitable relief by injunction was granted. In Goldfield Consol. Mines Co. v. Goldfield M. U. No. 220, 159 F. 500 (C.C.D.Nev.1908), the complainant was a mining company engaged in the business of mining, developing, and operating the property of certain other corporations in which property as such it had no interest although it did own stock in the corporations. Its mining operations were interfered with by a labor dispute. It was held to be entitled to injunctive relief in protection of its right to carry on its business. The court said:

"The allegations of the bill show that complainant is engaged in the business of mining, developing, and operating the property of these corporations, and that respondents, unless restrained, will unlawfully interfere with this business. The right to operate a mine and carry on the business of mining therein is property, whether the operator owns the mine or not. It is a right as distinct and real as the ownership of the fee itself. If complainant has such right, it has the further right to enjoy such property, and to operate the mines free from unlawful molestation and interference, and it naturally follows that the power of a court of equity may be invoked to protect such right, even though the operator may not own the mine, or even a share of stock in the company which does own the mine." [159 F. at page 512]

In American Mercury, Inc. v. Chase, 13 F.2d 224 (D. C. Mass. 1926), the appellants, interested in protecting the morals of the reading public, engaged themselves in scrutinizing books and magazines offered for sale. If they believed that a book or article violated the law, they informed large distributors of their opinion, with the intimation, express or implied, that if the book or magazine were sold prosecution would follow. That practice was followed as to a particular issue of the American Mercury magazine, and the appellants avowed their intention to follow it in respect of future issues which seemed to them objectionable. This seriously inter-

fered with the sale of the magazine, and the American Mercury, Inc.; sought equitable relief. The opinion dealt largely with the question whether the conduct of the appellants was illegal. An injunction was granted, however, and the predicate of such relief was that the lawful business of selling magazines was entitled to equitable protection against illegal acts. See also Baker-Whiteley Coal Co. v. Baltimore & O. R. R., 4 Cir., 188 F. 405, 416 (1911); Dittgen v. Racine Paper Goods Co., 164 F. 84 (C. C. E. D. Wis. 1905).

## II.

**Is** the proposed transfer of lands to Harvey by the Secretary of the Interior an illegal act against which the appellants may invoke the jurisdiction of equity?

 The appellees defend the proposed transfer as legal upon the theory that Harvey had, prior to the passage of the Taylor Grazing Act and the issuance of the Executive Order of 1934 thereunder, a valid and existing right to the consummation of the transfer. The Taylor Grazing Act contains a saving clause:

"Nothing in this Act shall be construed in any way to diminish, restrict, or impair any right which has been heretofore or may be hereafter initiated under existing law validly affecting the public lands, and which is maintained pursuant to such law except as otherwise expressly provided in this Act . . . ." 43 U.S.C.A. § 315. And the Executive Order of November 26, 1934, provided that: "The withdrawal hereby effected is subject to existing valid rights."

Whether Harvey had a valid and existing right must be determined by the Act of February 7, 1929, 45 Stat. 1154, under which he originally applied for the transfer. That Act provided:

"That whenever the owner or owners of any privately owned lands, situated . . . within the present boundaries of the Lincoln National Forest, shall submit to the Secretary of Agriculture a proposal for the exchange of said lands for lands upon the public domain situated elsewhere in the State of New Mexico, and such Secretary shall be of opinion that the acquirement of the same by the United States for national-forest purposes would be beneficial thereto, he is hereby authorized and empowered to transmit to the Secretary of the Interior such offer so made to him, together with such recommendations as he may see proper to make in connection therewith . . . and if he shall recommend the acquirement of the same by the United States under the provisions hereof, then, in such event, the Secretary of the Interior shall be, and hereby is, authorized and empowered, in his discretion, to enter into and conclude negotiations with such owner or owners thereof, and in exchange for such designated privately owned lands, and upon conveyance by the owner or owners thereof to the United States by a good and sufficient deed, to cause to be patented to such owner or owners' such acreage of nonmineral, nonirrigable grazing lands not suitable for agricultural purposes, except for raising grass, situated within the said State of New Mexico. . . ."

On August 15, 1929, Harvey, being the owner of lands within the borders of the Lincoln National Forest, filed an application with the Secretary of the Interior proposing the exchange involved in this case.[3] After proceedings not necessary to mention, the Department of the Interior suspended action on the application on December 8, 1932. This suspension was based upon an opinion of November 30, 1932, by the Department's Solicitor ruling that the Act of February 7, 1929, contemplated that the deed for private lands to be exchanged for public lands under the Act must be in fee simple without reservation. We refer to this opinion in greater detail below. It appeared, and is not now disputed, that Harvey's lands were subject to a reservation of mineral rights in the State of New Mexico.

Under these circumstances we are unable to conclude that Harvey acquired any rights by his application which were saved from the operation of the Taylor Grazing Act or the Executive Order of 1934. The only right granted by the Act of February 7, 1929, was a right to propose an exchange of lands and to invoke the exercise of the discretion of the Secretaries thereon. Whether an exchange should be effectuated was left by the statute wholly within the discretion of the Secretary of the Interior. Of course, that discretion

---

[3] This seems not consistent with the statute providing for submission of owner's exchange proposals first to the Secretary of Agriculture and then by him to the Secretary of the Interior. But no point is made of this in the briefs.

was to be exercised upon considerations of public interest, but it was nevertheless a discretion which an applicant could not as a matter of law compel the Secretary to exercise in his favor. Hence the mere application for an exchange by Harvey did not create any right in him. And neither the subsequent proceedings referred to, nor the order of December 8, 1932, suspending action on that application, could create a right. Such a right could not arise at least until the Secretary approved the proposed exchange.

The appellees cite no judicial authority for the proposition that Harvey obtained a valid right to a transfer under the provisions of the Act of February 7, 1929. They do cite an opinion of the Solicitor of the Department of the Interior relating to the meaning of the phrase "existing valid rights" used in the saving clause of the Executive Order of November 26, 1934, 55 I. D. 205. The pertinent portions are as follows:

"It is hardly practicable to give a precise and general definition of the meaning of 'existing valid rights', as used in the saving clause of the said Executive order. The circumstances of each particular case will have to be considered in applying that provision. . . .

"Of course, all valid entries are protected, and I believe also that all prior valid applications for entry, selection, or location, which were substantially complete at the date of the withdrawal should be considered as constituting valid existing rights within the meaning of the saving clause of the withdrawal order. . . . I believe this protective provision should be generously applied." [55 I. D. at 210-11]

Since the Harvey application can hardly be accurately characterized as an application for entry, selection, or location, the opinion seems not to consider the precise problem with which we are here confronted. Moreover, it will be noted that the Solicitor was careful to restrict the opinion to prior *valid* applications. The Solicitor in 1932 had ruled that Harvey's application could not validly be approved

under the then existing legislation because Harvey lacked an unrestricted fee to the lands which he proposed to exchange; we cannot say, upon examining the statute, that the Solicitor was plainly in error. Finally, the opinion, so far as it may be thought to support the appellees' point of view, represents only an administrative construction of the statute and Executive Order, and while it is worthy of consideration, it is not binding upon the court.

Our view that Harvey acquired no right saved under the Taylor Grazing Act and the Executive Order of 1934 makes it unnecessary for us to discuss Clipper Mining Co. v. Eli Mining & Land Co., 194 U.S. 220, 24 S.Ct. 632, 48 L.Ed. 944 (1904), and Fisher v. Rule, mentioned supra on another point, urged by the appellees for the proposition that the effect of the suspension order of 1932 was to preserve the *status quo* rather than to operate as a rejection of the Harvey application.

It is further contended, however, by the appellees that the Act of June 25, 1935, 49 Stat. 422, 16 U.S.C.A. § 486 note, authorized the proposed exchange of lands. This legislation apparently resulted from the opinion of November 30, 1932, by the Solicitor of the Interior Department, in which, as above indicated, he ruled that the Act of February 7, 1929, required that a deed in fee simple without reservation be given by parties to an exchange thereunder. He reasoned that the Act of February 28, 1925, 43 Stat. 1090, which amended the Act of March 20, 1922, 42 Stat. 465, 16 U.S.C.A. § 486,[4] by providing that "Either party to an exchange may make reservations of timber, minerals, or easements, the values of which shall be duly considered in determining the values of the exchanged lands," could not be read in connection with the Act of February 7, 1929, so as to permit the reservation of mineral rights in an exchange thereunder, because by the exchanges mentioned in the Act of 1925 were meant only those authorized by the general Act of 1922, and not those authorized by special legislation like the Act of 1929.

[4] That Act provided in part as follows: "when the public interests will be benefited thereby, the Secretary of the Interior be, and hereby is, authorized in his discretion to accept on behalf of the United States title to any lands within the exterior boundaries of the national forests which, in the opinion of the Secretary of Agriculture, are chiefly valuable for national forest purposes, and in exchange therefor may patent not to exceed an equal value of such national forest land, in the same State, surveyed and nonmineral in character . . . ."

The Solicitor advised, therefore, that further legislation would be necessary to authorize the Harvey exchange.

The Act of June 25, 1935, 49 Stat. 422, provided as follows:

"Be it enacted . . . that the provisions of section 2 of the Act of Congress approved February 28, 1925 (43 Stat. 1090; U.S.C., title 16, sec. 486), authorizing reservations by either party to an exchange under the Act of Congress approved March 20, 1922 (42 Stat. 465; U.S.C., title 16, sec. 485), are hereby extended and made applicable to exchanges of lands under the Acts of Congress approved February 14, 1923 (42 Stat. 1245), and February 7, 1929 (45 Stat. 1154), which authorize the United States to acquire privately owned lands situated within certain townships in the Lincoln National Forest in the State of New Mexico, by exchanging therefor an equal value of unreserved and unappropriated public lands within said State."

From this statute the parties seek to draw opposite conclusions. The appellees contend that the Act specifically validates and authorizes the Harvey exchange. On the other hand, the appellants assert that the Act does not validate the transfer, but necessarily forbids it. They point to the provision that the public lands in New Mexico to be exchanged for privately owned lands in the Lincoln National Forest are to be "unreserved and unappropriated public lands"; they point further to the Executive Order of 1934, which expressly orders "that all of the vacant, unreserved and unappropriated public land in . . . New Mexico . . . be, and it hereby is, temporarily withdrawn from settlement, location, sale or entry, and reserved for classification, and pending determination of the most useful purpose to which such land may be put in consideration of the provisions of said act of June 28, 1934, and for conservation and development of natural resources." Thus, say the appellants, there was no unreserved and unappropriated public land left within the State of New Mexico after the Executive Order of 1934 which could be the subject of exchange under the Act of February 7, 1929, as supplemented by the Act of June 25, 1935.

We think that this position of the appellants is not assailable. The language of the Act of June 25, 1935, which refers only to exchanges of "unreserved and unappropriated public lands" is plain and unambiguous. The appellees tell us that this limitation is but a relative clause modifying the Act of 1929 and is merely explanatory thereof. Conceding this, we are unable to see that it aids the appellees. On the contrary, it seems to reinforce the view that under these enactments only exchanges of unreserved lands are permitted. That is to say, even if the Act of June 25, 1935, be looked upon as an explanation of, or interpolation into, the Act of February 7, 1929, this results only in giving that Act a meaning by which it authorizes only exchanges of "unreserved and unappropriated lands."

The appellees tell us further that the legislative history [5] of the Act of June

---

[5] The legislative history invoked is S. Rep. No. 617, 74th Cong., 1st Sess. (1935), accompanying S. 1066. After recommending that the bill pass, the report quotes in full the following letters:

"Department of the Interior,
 "*Washington, March 23, 1935.*
"Hon. Robert F. Wagner,
 "*Chairman Committee on Public Lands and Surveys,*
 *United States Senate.*
"My Dear Senator Wagner: I have received your letter of January 18, requesting an opinion on the merits of S. 1066, Seventy-fourth Congress, first session, entitled: 'A bill to extend the provisions of section 2 of the act of February 28, 1925, authorizing reservations of timber, minerals, or easements to exchanges of lands in the State of New Mexico, under the act of February 14, 1923, and the act of February 7, 1929.'

"Under the proposed bill either party to an exchange under the aforementioned acts of 1923 and 1929 would be permitted to make reservations of timber, minerals or easements, the values of which shall be duly considered in determining the values of the exchanged lands.

"The act of February 14, 1923 (42 Stat. 1245), and the act of February 7, 1929 (45 Stat. 1154), provide for exchanges of privately owned lands within the Lincoln National Forest in the State of New Mexico for an equal value of lands of the public domain in the same State.

"Shortly after the enactment of the aforesaid act of 1929, an application under that act was filed in this Department by one C. M. Harvey, but it was revealed that all minerals in the lands offered the

25, 1935, makes clear that it was passed as a recognition by the Congress of Harvey's existing right, and for the purpose of validating the proposed exchange. We have already ruled that Harvey had no existing right. And we cannot, we think, properly consult the legislative history, whether or not it may be said to show that the purpose of the legislation was to validate the Harvey exchange. In the Act of June 25, 1935, we are dealing with language which, we think, is quite without ambiguity, and under very well settled rules we cannot, under such circumstances, resort to legislative history; we must abide the will of Congress as plainly expressed. United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175 (1932); see Note, 70 A.L.R. 5, 14-16 (1929).

Finally, the appellees say that to construe the Act of June 25, 1935, as not validating the proposed Harvey exchange is to render the Act nugatory, and they cite Mills v. St. Clair County, 8 How. 569, 12 L.Ed. 1201 (1850), for the proposition that a statute will not be given a con-

---

United States in the proposed exchange were reserved to the State of New Mexico, and as the 1929 act made no provision for reservations of any nature, the exchange could not be allowed. Thereafter the Department of Agriculture requested of this Department that further action on the Harvey application be suspended to await further legislation, which request was granted, and the proposed bill is evidently intended to effectuate the removal of the existing bar to the consummation of the Harvey exchange.

"The Department is informed that there is local opposition to the Harvey exchange, founded on the premise that the public lands involved should be administered under the provisions of the Taylor Grazing Act of June 28, 1934 (48 Stat. 1269), the objectives of which, as set forth in the caption of the bill, are:

"'To stop injury to the public grazing lands by preventing overgrazing and soil deterioration, to provide for their orderly use, improvement, and development, to stabilize the livestock industry dependent upon the public range, and for other purposes.'

"However, if it is the judgment of the Congress that this legislation should be enacted, I shall interpose no objection to its passage.

"Sincerely yours,

"T. A. Walters, *Acting Secretary.*"

---

"February 2, 1935.

"Hon. Robert F. Wagner,

"*Chairman Committee on Public Lands and Surveys,*

*United States Senate.*

"Dear Senator Wagner: Reference is made to your letter of January 18 enclosing copy of Senate 1066, a bill, 'To extend the provisions of section 2 of the act of February 28, 1925, authorizing reservations of timber, minerals, or easements to exchanges of lands in the State of New Mexico, under the act of February 14, 1923, and the act of February 7, 1929', and asking for a report thereon.

"Acts passed on February 14, 1923 (42 Stat. 1245), and February 7, 1929 (45 Stat. 1154), authorized the exchange, on the basis of equal value, of certain privately owned lands within the boundaries of the Lincoln National Forest in New Mexico for public lands within the same State. There was no provision in the laws for the reservation of mineral rights, either by the United States or the parties who would convey to the Government, as is found under the Forest Exchange Act of March 20, 1922 (42 Stat. 465). The authority for the reservation of mineral rights by either party to the exchange under the General Forest Exchange Act is found in the act of February 28, 1925 (43 Stat. 1090).

"There are now pending applications for exchange under the abovementioned acts of February 14, 1923, and February 7, 1929, whereby the Government would acquire, if the exchanges should be approved, very desirable forest-producing lands lying within the boundaries of the Lincoln National Forest. Some of these lands while now in private ownership were formerly owned by the State of New Mexico and as to these the State, under its general policy in disposing of the lands, reserved the minerals in them. Insofar as known, there are no mineral values. In any event it would not be objectionable, as this Department sees it, to acquiring the lands with the mineral rights outstanding in the State since, insofar as the Federal Government is concerned, the lands are desired for forestry purposes and to round out the Government's holdings within the Lincoln National Forest.

"In the judgment of this Department the enactment of the proposed legislation would be very much in the public interest and, therefore, it recommends favorable action by your committee on Senate bill 1066.

"Sincerely yours,

"H. A. Wallace, *Secretary.*"

struction rendering it nugatory. This argument again considers the statute subject to two constructions rather than plain and unambiguous. But in any event Mills v. St. Clair County hardly gives comfort to the appellees. In that case the Illinois legislature had passed an act granting to the complainant's assignor the right to run a ferry over the Mississippi River from lands "that may belong to him", provided that the ferry should be put into operation within 18 months from the passage of the act. When the act was passed the complainant's assignor had no lands, but within the 18 months' period he acquired lands which he and the complainant subsequently used as a base for the ferry. The Supreme Court held that the statute should be construed to cover the lands so acquired and accordingly that the complainant's assignor had acquired a valid grant. We think that this is much the same as construing the present statute to mean that exchanges may be effected of lands which may in the future become, by action of the Secretary of the Interior, unreserved and unappropriated, and that the case does not at all compel the conclusion that an exchange of presently reserved and appropriated lands should be permitted. That is to say, the Act of June 25, 1935, is not necessarily nugatory if it be said not to validate the proposed Harvey transfer, because conceivably there may be in the future unreserved and unappropriated lands upon which it can operate.

■ We reach the conclusion, therefore, that the proposed exchange is not warranted upon the theory that Harvey had a valid and existing right saved from the Executive Order of 1934, and that the exchange is not authorized by the Act of June 25, 1935. Hence we reach the general conclusion that the proposed transfer is an illegal invasion of the asserted rights of the appellants which a court of equity has jurisdiction to enjoin.

### III.

■ We are confronted next with the question whether or not any considerations exist which make improper the exercise of equity jurisdiction in the instant case. In this aspect of the case the appellees urge three points. First, they say that an injunction will not issue, any more than will mandamus, to interfere with the discretion of an administrative officer in construing a statute. The rule is, of course, too well settled to require discussion that mandamus will not issue to interfere with the discretion of an administrative officer in construing a statute even though the court would construe the statute otherwise, provided the officer's construction is reasonably possible. United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 51 S.Ct. 502, 75 L.Ed. 1148 (1931); Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809 (1930); Calf Leather Tanners' Ass'n v. Morgenthau, 65 App.D.C. 93, 80 F.2d 536 (1935). And we may concede, without ruling, that there is the same limitation upon the issuance of an injunction to control the action of administrative officers. Cf. Gaines v. Thompson, 7 Wall. 347, 19 L.Ed. 62 (1868). But the rule is not applicable in the instant case because, as above pointed out, the Act of June 25, 1935, is plain and unambiguous in its meaning, and therefore not subject to construction. Hence no question of interference with an administrative officer's discretion is involved.

■ Second, the appellees argue that an injunction should not issue because where a patent to public land is involved the courts should not interfere until the proceedings in the Department of the Interior have been brought to a conclusion by the issuance of a patent; thereafter, say the appellees, an aggrieved person will have an adequate remedy by a bill in equity at the situs of the land patented to impress it with a trust. And the appellees say that in the instant case, when the proposed exchange to Harvey has been consummated and patent issued to Harvey, the appellants may proceed in a proper court in New Mexico. The appellees apparently liken the appellants' rights, if any, to an equitable servitude, and say that when patent is issued to Harvey he will take the land subject to this servitude just as the purchaser of a reversion would take subject to an existing lease. The appellees rely upon Brown v. Hitchcock, 173 U.S. 473, 19 S.Ct. 485, 43 L.Ed. 772 (1899), and State of Minnesota v. Lane, 247 U.S. 243, 38 S.Ct. 508, 62 L.Ed. 1098 (1918), for the proposition that the courts will not interfere until the administrative process has ended with the issuance of a patent to one of the contesting parties. The cases cited support this proposition as a general rule. In Brown v. Hitchcock the plaintiff's pre-

decessor in title had acquired by purchase from the State of Oregon lands which that State had selected under the Federal Swamp Lands Act of 1850, 9 Stat. 519. No patent for the lands had, however, been issued by the United States. Subsequently, the Secretary of the Interior commenced proceedings to cancel the selection made by the State of Oregon on the·ground that the lands selected were not swamp lands, and he proposed to open the lands to entry by the general public. The plaintiff sued to enjoin the Secretary of the Interior from such action. The Supreme Court held that the injunction should not issue, stating that the appellant must wait for his remedy until the lands had been patented to others and the legal title had gone out of the United States. In State of Minnesota v. Lane, an injunction was refused against the Secretary of the Interior on similar grounds, the underlying dispute there being between the State of Minnesota and a private corporation, each claiming the same lands under different statutes. For the proposition that after the issuance of a patent one claiming an equitable interest in the land may sue the patentee at the situs of the land to impress a trust thereon, the appellees rely upon United States v. Lane, 48 App.D.C. 279 (1919), and Cohen v. Fall, 52 App.D.C. 140, 284 F. 734 (1922). These cases recognize such a right of action.

We are unable to conclude, however, that under any of these cases, or the principles represented thereby, the appellants in the instant case must be denied injunctive relief. In each of these cases the contest was over title to the land itself, whereas in the instant case the appellants assert a different type of right. We think it not to be concluded that because one claiming outright title cannot have injunctive relief prior to the issuance of patent, one claiming less is *a fortiori* not entitled to such relief. The underlying theory of Brown v. Hitchcock and State of Minnesota v. Lane is that equity will not grant relief where there is another adequate remedy, and United States v. Lane and Cohen v. Fall recognize that one who asserts an equitable interest in the land itself has an adequate remedy against a patentee. The appellants in the instant case have no interest in the land itself, and we think they have no such interest as may be said to be in the nature of a servitude or the proper subject of a

trust. Hence the remedy recognized in United States v. Lane and Cohen v. Fall would seem not to be available. But, as we have demonstrated in topic I· of this opinion, it does not follow that because the rights or privileges of the appellants as licensee-permittees do not rise to the dignity of vested interests in the land itself, such rights as the appellants have either to the use of the lands during the existence of their licenses and permits, or to the conduct of a lawful business, are not the proper subjects of equitable protection.

Moreover, that the principle of Brown v. Hitchcock and State of Minnesota v. Lane is not without exception is illustrated by Noble v. Union River Logging R. R., 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123 (1893), and Work v. Louisiana, 269 U.S. 250, 46 S.Ct. 92, 70 L.Ed. 259 (1925). In the Noble Case the Supreme Court held that one Secretary of the Interior could not revoke the decision of his predecessor to the effect that the appellee railroad company was entitled to a right of way under an Act of Congress, and that he might be restrained from doing so by injunction. In Work v. Louisiana the State of Louisiana sought an injunction in connection with its prosecution of a swamp lands claim under the Acts of 1849 and 1850. The bill alleged that the Secretary of the Interior had imposed upon the State of Louisiana the burden of showing that the lands were non-mineral and had denied its claim when it had not undertaken this burden. The bill prayed that the Secretary be enjoined from taking further action in enforcement of this ruling. The contention was made that the trial court was without jurisdiction to entertain the bill because it was premature in that it was brought before the Secretary had exercised his jurisdiction to determine the character of the lands and while the claim was still in the process of administration. But these contentions were rejected by the Court, which held that, if the order exceeded the authority conferred upon the Secretary by law and was an illegal act done under color of his office, he might be enjoined from carrying the order into effect. Certainly these two cases taken together demonstrate that under some circumstances proposed action of the Secretary of the Interior may be restrained by injunction even while proceedings are still pending before the Department and before legal title to lands about which there is

dispute has passed from the government. We think that the instant case also presents facts which warrant an injunction prior to the conclusion of the administrative process.

■ Third, the appellees urge that under Section 7 of the Taylor Grazing Act, 43 U.S.C.A. § 315f, the Secretary of the Interior may in his discretion examine the lands within the Grazing District which are now the subject of the appellants' licenses and which are now, under the Act and the Executive Order of 1934, withdrawn from settlement, location, sale or entry, may classify them as more valuable or suitable "for acquisition in satisfaction of any . . . exchange . . . rights . . . and . . . [may] open such lands to entry, selection, or location for disposal in accordance with such classification under applicable public-land laws . . . ." Thus, argue the appellees, the Secretary has power under this section, coupled with the Act of June 25, 1935, legally to consummate the proposed Harvey transfer; hence any injunction issued in the instant case may be rendered futile, and therefore none should be issued.

But we think that this argument against the issuance of an injunction is not meritorious. It assumes both that the Secretary will seek to consummate the proposed Harvey exchange in that manner under Section 7 and that he can lawfully do so. We think we ought not rule, even impliedly, in the instant case that the Secretary either will or can so effectuate the transfer. Whether he will desire to do so necessarily involves questions of policy and discretion. The Secretary might determine as a matter of policy that it would not be in the best interests of the general administration of the Taylor Grazing Act to drop lands from organized districts for exchange purposes. We should not assume that he will come to a contrary decision. Moreover, we should not decide, until the point is necessarily before us and we have the benefit of argument thereon, whether the Secretary can legally consummate the proposed exchange in that way.

Indeed, it seems contrary to proper equitable considerations to decide, as we have decided, that the exchange, as now proposed to be carried out, is illegal and to refuse, nevertheless, to restrain it because the same objective may conceivably be obtained in another manner not illegal. To do this would in effect be to sanction the performance of an act which is now illegal; for if we refuse to issue the injunction, it can hardly be doubted that the transfer will be effected in the very manner proposed in the instant case. At least we are bound so to conclude under the motion to dismiss, which admits the allegations so charging.

We are, moreover, not convinced that the instant case falls within the class of cases in which equity refuses relief because to grant it would be futile. Such cases involve situations wherein equity for some physical reason cannot enforce a decree, for example, where extraterritorial power would be required to do so, or wherein physical performance is impossible, or situations wherein, a case having become moot, relief would be futile. See, e. g., Royal Fraternal Union v. Lundy, 51 Tex.Civ.App. 637, 113 S.W. 185 (1908) (extraterritorial); McCabe v. Watt, 224 Pa. 253, 73 A. 453, 24 L.R.A.,N.S., 274 (1909); Cameron v. City of Carbondale, 227 Pa. 473, 76 A. 198, 28 L.R.A.,N.S., 494 (1910) (difficulties of supervision); Hubrite Informal Frocks, Inc. v. Kramer, 9 N.E.2d 570 (Mass. 1937) (moot).

■ The relief to be granted in the instant case must, however, be reduced below that sought in the prayer. The prayer seeks an injunction against the effectuation of the exchange, not only in the manner proposed in the instant case, but in any manner. Such an injunction would exclude the possibility of recourse to the provisions of Section 7 as suggested by the appellees. The injunction will issue against the consummation of the exchange in the manner now proposed, but without prejudice to a future ruling as to whether the Secretary has power to carry out the transfer by dropping the lands from the district as it is claimed he may do under Section 7. That question, for the reasons set forth above, we shall not rule upon in advance.

Reversed and remanded for further proceedings in accordance with this opinion.